**COMMON CAUSE/GEORGIA, LEAGUE OF WOMEN VOTERS OF GEORGIA, INC., The Central Presbyterian Outreach and Advocacy Center, Inc., Georgia Association of Black Elected Officials, Inc., The National Association for the Advancement of**

Colored People (NAACP), Inc., through its Georgia State Conference of Branches, Georgia Legislative Black Caucus, Concerned Black Clergy of Metropolitan Atlanta, Inc., and Clara Williams, Plaintiffs,

v.

Ms. Evon BILLUPS, Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County and the City of Rome, Georgia, Tracy Brown, Superintendent of Elections of Bartow County, Georgia, Mr. Gary Petty, Member of the Board of Elections and Registration of Catoosa County, Georgia, Michelle Hudson, Member of the Board of Elections and Registration of Catoosa County, Georgia, Ron McKelvey, Member of the Board of Elections and Registration of Catoosa County, Georgia, Judge John Payne, Superintendent of Elections of Chattooga County, Georgia, Shea Hicks, Superintendent of Elections for Gordon County, Georgia, Jennifer A. Johnson, Superintendent of Elections for Polk County, Georgia, Mr. Sam Little, Superintendent of Elections for Whitfield County, Georgia; Individually and in their Respective Official Capacities as Superintendents or Members of the Elections Board in their Individual Counties, and as Class Representatives, Hon. Cathy Cox, Individually and in her Official Capacity as Secretary of State of Georgia and Chair of the Georgia Elections Board, Defendants.

No. CIVA 4:05CV0201 HLM.

United States District Court, N.D. Georgia, Rome Division.

July 14, 2006.

David G.H. Brackett, Emmet J. Bondurant, II, Jason James Carter, Bondurant Mixson & Elmore, Miles J. Alexander, Kilpatrick Stockton, Ralph Irving Knowles, Jr., Doffermyre Shields Canfield Knowles & Devine, Elizabeth Lynn Littrell, Gerald R. Weber, Margaret Fletcher Garrett, Meredith Bell–Platts, Moffatt Laughlin McDonald, Neil T. Bradley, Tisha Rae Tallman, Atlanta, GA, Edward Hine, Jr., Office of Edward Hine, Jr., Rome, GA, Jon M. Greenbaum, Washington, DC, for Plaintiffs.

Michael D. McRae, Smith Shaw & Maddox, Cedartown, GA, Thomas Hunter Manning, Smith Shaw & Maddox, Rome, GA, Peter R. Olson, Jenkins & Olson, Cartersville, GA, Clifton M. Patty, Jr., Office of Clifton M. Patty, Jr., Ringgold, GA, Lewis Branch Sutton Connelly, Cook & Connelly, Summerville, GA, Martha Suzanne Hutchinson, Calhoun, GA, Brad J. McFall, Gammon & Anderson, Cedartown, GA, Robert Harris Smalley, III, McCamy Phillips Tuggle & Fordham, Dalton, GA, Anne Ware Lewis, Strickland Brockington Lewis, Mark Howard Cohen, Troutman Sanders, Stefan Ernst Ritter, Office of State Attorney General, Atlanta, GA, for Defendants.

## *ORDER*

HOWARD L. MURPHY, District Judge.

This case is an action to have the photo identification ("Photo ID") requirement set forth in Senate Bill 84 ("The 2006 Photo ID Act"), declared unconstitutional both on its face and as applied, and to enjoin its enforcement on the ground that it imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of article II, section 1, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty–Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. § 1971(a)(2)(A) and (a)(2)(B)), and Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)). This case is before the Court on Plaintiffs' Second Motion for Preliminary Injunction [108].

## I. Procedural Background

On September 19, 2005, Plaintiffs filed this lawsuit. Plaintiffs initially asserted that the Photo ID requirement in the 2005 Amendment to O.C.G.A. § 21–2–417 (Act No. 53) ("The 2005 Photo ID Act") violated the Georgia Constitution, was a poll tax that violated the Twenty-fourth Amendment and the Equal Protection Clause, unduly burdened the fundamental right to vote, violated the Civil Rights Act of 1964, and violated Section 2 of the Voting Rights Act of 1965.

On September 19, 2005, Plaintiffs requested that the Court schedule a prelimi-

nary injunction hearing. On that same day, the Court entered an Order scheduling a preliminary injunction hearing for October 12, 2005. (Order of Sept. 19, 2005.)

On October 6, 2005, Plaintiffs filed a formal Motion for Preliminary Injunction. On October 7, 2005, Secretary of State Cox filed a Motion to Dismiss Individual Capacity Claims. On October 11, 2005, individual Plaintiff Tony Watkins filed a Stipulation of Dismissal Without Prejudice of his claims. Finally, on October 12, 2005, Plaintiffs filed their First Amendment to Complaint, which addressed the issue of standing for the organizational Plaintiffs.

On October 12, 2005, the Court held a hearing with respect to Plaintiffs' Motion for Preliminary Injunction. During the October 12, 2005, hearing, the parties presented evidence and arguments in support of their respective positions.

On October 18, 2005, the Court entered an Order granting Plaintiffs' Motion for Preliminary Injunction and finding that Plaintiffs had a substantial likelihood of success on their claims that the 2005 Photo ID Act unduly burdened the right to vote, and that the 2005 Photo ID Act constituted a poll tax. (Order of Oct. 18, 2005.) On October 19, 2006, the Court denied the State Defendants' Motion to Dismiss Individual Capacity Claims. (Order of Oct. 19, 2005.) On October 20, 2005, The Court denied the State Defendants' Motion to Stay Preliminary Injunction Pending Appeal. (Order of Oct. 20, 2005.)

The State Defendants appealed the October 18, 2005, Order to the United States Court of Appeals for the Eleventh Circuit, requesting that the Eleventh Circuit stay the Court's October 18, 2005, Order pending resolution of the appeal. On October 27, 2005, the Eleventh Circuit denied the State Defendants' Motion to stay the October 18, 2005, Order pending resolution of the appeal.

In January 2006, the Georgia General Assembly passed the 2006 Photo ID Act, which Governor Purdue signed into law. On February 23, 2006, Plaintiffs filed a Motion for Leave to File Second Amended Complaint. In that Motion, Plaintiffs sought permission to amend their First Amended to Complaint to assert claims that both the 2005 Photo ID Act and the 2006 Photo ID Act violated the Georgia Constitution, the federal Equal Protection Clause, the Fourteenth and Twenty–Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964, and Section 2 of the Voting Rights Act of 1965. On March 2, 2006, the Court held a telephone conference with counsel to discuss the issues relating to preclearance of the 2006 Photo ID Act by the United States Department of Justice ("DOJ"). The Court stayed the proceedings in this case pending notification of the DOJ's decision concerning preclearance of the 2006 Photo ID Act. (Order of Mar. 2, 2006.)

On April 21, 2006, Secretary of State Cathy Cox filed a Notice of Section 5 Preclearance of Act 432 (SB 84). On that same day, the Court entered an Order lifting the stay in this case, and setting forth a briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction. (Order of Apr. 21, 2006.) On April 26, 2006, Plaintiffs filed their Second Amended Complaint.

On May 5, 2006, Plaintiffs filed a Motion to Revise Scheduling Order of April 21, 2006, pending the State Election Board's adoption of rules and regulations implementing the 2006 Photo ID Act, and pending DOJ preclearance of those rules and regulations. On that same day, the Court approved a Consent Order revising the briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction to re-

quire Plaintiffs to file that Motion within ten days after the rules and regulations adopted by the State Election Board received preclearance from DOJ. (Order of May 5, 2006.)

On May 10, 2006, Secretary of State Cathy Cox and the State Election Board filed a Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part. On May 25, 2006, Plaintiffs filed a Second Motion for Order to Certify Questions of State Law to the Georgia Supreme Court. On June 29, 2006, the Court entered an Order granting the Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part, dismissing Counts One and Three of Plaintiffs' Second Amended Complaint, as well as the portions of Counts Two, Five, and Six of Plaintiffs' Second Amended Complaint that challenged the 2005 Photo ID Act. (Order of June 29, 2006.) In that same Order, the Court denied Plaintiffs' Second Motion for Order to Certify Question of Law to the Georgia Supreme Court. (*Id.*)

After the Court's June 29, 2006, Order, the following claims asserted in Plaintiffs' Second Amended Complaint remain pending. In Count Two of their Second Amended Complaint, Plaintiffs contend that the Photo ID requirement imposes an undue burden on the right to vote, in violation of the Equal Protection Clause. (Second Am. Compl. ¶¶ 89–91.) In Count Four of their Second Amended Complaint, Plaintiffs assert that the 2006 Photo ID Act is an unconstitutional poll tax if it is construed or applied to require voters to pay a fee for a birth certificate or other documents to obtain a Georgia voter Photo ID card. (*Id.* ¶¶ 96–97.) In Count Five of their Second Amended Complaint, Plaintiffs allege that the Photo ID requirement violates the Civil Right Act of 1964, as set forth in 42 U.S.C.A. §§ 1971(a)(2)(A) and

1971(a)(2)(B). (*Id.* ¶¶ 98–102.) Finally, in Count Six of their Second Amended Complaint, Plaintiffs assert that the Photo ID requirement violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973(a). (*Id.* ¶¶ 103–106.)

On June 30, 2006, following a telephone conference with counsel, the Court entered an Order setting forth the briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction, and directing the parties to appear before the Court for a hearing on the Motion at 10:00 a.m. on July 12, 2006. (Order of June 30, 2006.)

On July 5, 2006, Plaintiffs filed their Second Motion for Preliminary Injunction. Plaintiffs have sought to have the 2006 Photo ID Act declared invalid, both on its face and as applied, and to enjoin its enforcement. Plaintiffs contend that 2006 Photo ID Act imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of Article II, section I, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty–Fourth Amendments to the United States Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. §§ 1971(a)(2)(A) and (a)(2)(B)), Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)), and 42 U.S.C.A. §§ 1983 and 1988. Plaintiffs request that the Court enter a preliminary injunction that prohibits Defendants from: (1) enforcing or attempting to enforce or apply the 2006 Photo ID Act and the regulations issued by the State Election Board under that Act at any elections in Georgia; or (2) discouraging, interfering with, or preventing any person who is lawfully registered from voting in person in any such elections, pending a final trial on the merits or a further Order from the Court. Plaintiffs request that the Court enjoin Defendants "and all state or local election officials be

further enjoined from making any public announcement or statements or other communications that advise registered voters or election officials in Georgia that registered voters may not cast a ballot in any election if the voter does not have one of the forms of photo identification specified in the 2006 Photo ID Act." (Pls.' Mot. Second Prelim. Inj. at 2.) Plaintiffs also ask the Court to order and direct Defendants "to send prompt written notice to each of the 675,000 registered voters who have been identified by the Secretary of State as not having Georgia driver's licenses, informing them that they are not required to present photographic identification as a condition to being admitted to the polls or allowed to vote and that they will not be discouraged, interfered with, or otherwise prevented from voting in person by defendants or other election officials on the ground that they are unable to present photographic identification to election officials at the polls." (*Id.* at 2–3.)

On July 7, 2006, the State Election Board filed a Motion to Dismiss Plaintiffs' Second Motion for Preliminary Injunction and to Cancel Hearing. That Motion to Dismiss followed a temporary restraining order issued by the Superior Court of Fulton County, Georgia, on July 7, 2006, enjoining the defendants in that case from enforcing the 2006 Photo ID Act during the July 18, 2006, primary election or any resulting run-off election. *Lake v. Perdue,* Civil Action File No.2006CV119207, slip op. at 3–4 (Fulton County Super.Ct. July 7, 2006.) The plaintiffs in *Lake* had argued that the 2006 Photo ID Act violated the Georgia Constitution. On July 10, 2006, following a telephone conference with counsel, the Court entered an Order indicating that the Court would postpone the July 12, 2006, preliminary injunction hearing in this case if the Supreme Court of Georgia entered an Order denying the *Lake* defendants' request to stay the tem-

porary restraining order in that case prior to July 12, 2006. (Order of July 12, 2006.)

On July 12, 2006, the Court held a hearing concerning Plaintiffs' Second Motion for Preliminary Injunction. Near the conclusion of the hearing, counsel received information that the Georgia Supreme Court had denied the *Lake* defendants' request to stay the temporary restraining order in that case, leaving the temporary restraining order in place for at least thirty days.

At the conclusion of the July 12, 2006, hearing, the Court orally granted Plaintiffs' Second Motion for Preliminary Injunction with respect to Plaintiffs' claim under the Equal Protection Clause. This Order formally sets forth the Court's findings and conclusions concerning Plaintiffs' Section Motion for Preliminary Injunction.

## II. Factual Background

### A. Plaintiffs' Allegations

#### 1. Allegations Noted in the October 18, 2005, Order

In the Court's October 18, 2005, Order, the Court set forth information concerning Plaintiffs' allegations with respect to the 2005 Photo ID Act. The Court incorporates that portion of the October 18, 2005, Order into this Order in the event that any of those allegations are relevant to this Order. (Order of Oct. 18, 2005, at 3–22.)

#### 2. The Parties

Plaintiff Common Cause/Georgia is a chapter of Common Cause, Inc. (Second Am. Compl. ¶ 1(a).) Common Cause is a non-partisan citizen lobby organized as a not-for-profit corporation under the laws of the District of Columbia, and is devoted to causes such as electoral reform, ethics in government, and the protection and preservation of the rights of all citizens to vote

in national, state, and local elections, including educating voters about voting rights and procedures. (*Id.*)

Plaintiff League of Women Voters of Georgia is a non-partisan Georgia non-profit corporation that was founded in 1920. (Second Am. Compl. ¶ 1(b).) Plaintiff League of Women Voters of Georgia's purpose is to encourage the informed and active participation by citizens in government at all levels, including the protection of the right of all citizens to vote and the education of voters about voting rights and procedures. (*Id.*)

Plaintiff The Central Presbyterian Outreach and Advocacy Center, Inc. is a Georgia non-profit corporation that provides support to people in poverty, including emergency services for basic human needs and assistance in achieving self-sufficiency, including assisting individuals in obtaining photo identification. (Second Am. Compl. ¶ 1(c).)

Plaintiff Georgia Association of Black Elected Officials, Inc. is an unincorporated association of more than 700 elected officials throughout the State of Georgia who regularly conduct election campaigns and seek the votes of all registered, eligible voters. (Second Am. Compl. ¶ 1(d).) It also promotes voter registration, education, and participation, preserves minority voting rights, and fights to ensure that no qualified voters are turned away on Election Day for failure to possess a photo ID card, or because of any other undue burden, in violation of their right to vote. (*Id.*)

Plaintiff the National Association for the Advancement of Colored People ("Plaintiff NAACP"), through its Georgia State Conference of Branches, is the nation's oldest civil rights organization. (Second Am. Compl. ¶ 1(e).) Plaintiff NAACP was formed in 1909 by a multiracial group of activists, and has nationwide membership as well as members and offices in Georgia. (*Id.*) Plaintiff NAACP has advocated for the advancement and protection of voting rights for minorities, and, throughout its history, has fought for access to the ballot, for its members and for others. (*Id.*) It also has fought to ensure that racial minorities, low income people, and economically disadvantaged people have access to the ballot box and an equal opportunity to participate in the political process. (*Id.*)

Plaintiff Georgia Legislative Black Caucus ("Plaintiff GLBC") was formed in 1966 and consists of elected African–American members of the House and Senate of the Georgia General Assembly. (Second Am. Compl. ¶ 1(f)). Plaintiff GLBC's members, as elected representatives, engage in election campaigns, seek votes of registered, eligible voters, and also seek to make certain that the right to vote of all eligible citizens is protected and that no eligible voters are discouraged or prevented from voting on election day for failure to possess a Photo ID card in violation of their right to vote. (*Id.*)

Plaintiff Concerned Black Clergy of Metropolitan Atlanta, Inc. is a non-partisan, interfaith religious organization of mostly African–American members and laity whose mission is to provide leadership, advocacy, and service to the poor, the homeless, and the helpless in the metropolitan Atlanta area, including protecting their rights as citizens to full participation in the democratic process, including the right to register and vote without undue interference. (Second Am. Compl. ¶ 1(g).)

Plaintiff National Council of Jewish Women, Inc. ("NCJW") is a volunteer organization that is inspired by Jewish values. (Second Am. Compl. ¶ 1(h).) Plaintiff NCJW works to improve the quality of life for women, children, and families, as well as to ensure individual and civil rights

and freedoms for all through a network of 90,000 members, supporters, and volunteers nationwide. (*Id.*)

All of the above Plaintiffs are non-profit organizations composed of members who would have standing to sue in their individual right for the allegations set forth in the Second Amended Complaint. (Second Am. Compl. ¶ 1(i).) The interests that those Plaintiffs and their members seek to protect in the Second Amended Complaint are germane to the purpose of each of those Plaintiffs, and neither the claim asserted nor the relief sought requires participation by the individual members of those Plaintiffs. (*Id.*)

Plaintiff Clara Williams is an African-American and duly qualified and registered voter residing in the City of Atlanta and Fulton County, Georgia. (Second Am. Compl. ¶ 2.) Plaintiff Williams does not possess a Georgia driver's license, passport, or other form of government issued Photo ID, or any other form of photographic identification specified in the 2006 Photo ID Act. (*Id.*)

Defendant Evon Billups is the Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County, Georgia, and is charged with the duty of conducting elections in Floyd County, Georgia, and the City of Rome, Georgia. (Second Am. Compl. ¶ 3(a)(i).) Plaintiffs have sued Defendant Billups in her individual and official capacities. (*Id.*)

Defendant Tracy Brown is the Superintendent of Elections for the Board of Elections and Voter Registration for Bartow County, Georgia, and is charged with the duty of conducting elections in Bartow County, Georgia. (Second Am. Compl. ¶ 3(a)(ii).) Plaintiffs have sued Defendant Brown in her official and individual capacities. (*Id.*)

Defendants Gary Petty, Michelle Hudson, Amanda Spencer, Ron McKelvey, and Nina Crawford are members of the Board of Elections and Voter Registration for Catoosa County, Georgia, and are charged with the duty of conducting elections in Catoosa County, Georgia. (Second Am. Compl. ¶ 3(a)(iii).) Plaintiffs have sued those Defendants in their official and individual capacities. (*Id.*)

Defendant Judge John Payne is the Superintendent of Elections for the Board of Registrars for Chattooga County, Georgia, and is charged with the duty of conducting elections in Catoosa County, Georgia. (Second Am. Compl. ¶ 3(a)(iv).) Plaintiffs have sued Defendant Payne in his official and individual capacities. (*Id.*)

Defendant Shea Hicks is the Superintendent of Elections for the Board of Elections and Registrations for Gordon County, Georgia, and is charged with the duty of conducting elections in Gordon County, Georgia. (Second Am. Compl. ¶ 3(a)(v).) Plaintiffs have sued Defendant Hicks in her official and individual capacities. (*Id.*)

Defendant Jennifer A. Johnson is the Superintendent of Elections for the Board of Elections and Voter Registration for Polk County, Georgia, and is charged with the duty of conducting elections in Polk County, Georgia. (Second Am. Compl. ¶ 3(a)(vi).) Plaintiffs have sued Defendant Johnson in her official and individual capacities. (*Id.*)

Defendant Sam Little is the Superintendent of Elections for the Board of Elections and Registration for Whitfield County, Georgia, and is charged with the duty of conducting elections in Whitfield County, Georgia. (Second Am. Compl. ¶ 3(a)(vii).) Plaintiffs have sued Defendant Little in his official and individual capacities. (*Id.*)

Defendant Cathy Cox is the Secretary of State for the State of Georgia, and is Chair of the State Election Board. (Second Am. Compl. ¶ 3(a)(viii).) Defendant Cox has been designated as the Chief Election Official for purposes of the federal Help America Vote Act of 2002, and also is the Chief Election Official for purposes of the National Voter Registration Act of 1933. (*Id.*) Plaintiffs have sued Defendant Cox in her individual and official capacities. (*Id.*)

The State Election Board is not specifically named as a Defendant in this action. (Second Am. Compl. ¶ 3(ix).) On October 5, 2005, however, the Court granted a request by the State Election Board to intervene in this action. (Order of Oct. 5, 2005.)

Plaintiffs allege that the superintendents and board members of the city and county boards of elections named in Paragraphs 3(a)(i) through 3(a)(vii) of the Complaint are members of a class that consists of superintendents and members of city and county boards of elections in each of the 159 counties in Georgia, who are so numerous as to make their joinder impracticable. (Second Am. Compl. ¶¶ 3(a), 6.) Plaintiffs seek certification of a defendant class of all superintendents and members of all city and county boards of election in Georgia under Federal Rule of Civil Procedure 23(b)(1) and (b)(2). (*Id.* ¶ 7.)

### 3. Allegations Concerning Pre–Existing Georgia Law

Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present identification as a condition of voting. (Second Am. Compl. ¶ 9.) In 1997, the Georgia General Assembly adopted O.C.G.A. § 21–2–417, which required registered voters in Georgia to identify themselves by presenting one of seventeen forms of identification to election officials

as a condition of being admitted to the polls and of being allowed to vote. (*Id.* ¶ 10.) Prior to its amendment in 2005, O.C.G.A. § 21–2–417 permitted, but did not require, registered voters to present a Georgia driver's license or other form of official photographic identification as a method of identification as a condition of voting. (*Id.* ¶ 11.) Voters, however, remained free to use any of eight other methods of identification for voting, including a birth certificate, a social security card, a copy of a current utility bill, a government check, a payroll check, or a bank statement showing the voter's name and address. (*Id.*) Additionally, voters who did not have, or could not find, one of the seventeen forms of identification specified in former O.C.G.A. § 21–2–417(a), were entitled to be admitted to the polls, to be issued a ballot, and to be allowed to vote simply by signing a statement under oath swearing or affirming that he or she is the person identified on the elector's certificate. (*Id.* ¶ 12.) Plaintiffs contend that this fail-safe provision was essential to ensure that no voter who possessed the qualifications specified in the Georgia Constitution and who had not been disenfranchised for one of the two reasons provided in the Georgia Constitution would be allowed to vote, thereby avoiding a conflict between the constitutional right to vote and the 1997 voter identification statute. (*Id.* ¶ 13.)

An August 25, 2005, memorandum from the Voting Section of the Department of Justice ("DOJ") indicates that the DOJ granted the 1997 Georgia voter identification statute preclearance under Section 5 of the Voting Rights Act "based on two main factors: (1) the fail-safe procedure ensured that voters were not turned away for lack of authorized identification, and (2) minority contacts did not urge an objection primarily because no voters would be

turned away if they did not have proper identification." (Second Am. Compl. ¶ 14 & Ex. A.)

### 4. The 2005 Photo ID Act

In 2005, the Georgia General Assembly adopted the 2005 Photo ID Act, which amended O.C.G.A. § 21–2–417 to require that all registered voters in Georgia who vote *in person* in all primary, special, or general elections for state, national, and local offices held on or after July 1, 2005, present a government-issued Photo ID to election officials as a condition of being admitted to the polls and before being issued a ballot and being allowed to vote. (Second Am. Compl. ¶ 15.) Representative Sue Burmeister, a Republican, sponsored the bill that became the 2005 Photo ID act. (*Id.* ¶ 16.) Representative Burmeister told the Voting Section of the DOJ "that if there are fewer black voters because of this bill, it will only be because there is less opportunity for fraud. She said that when black voters in her black precincts are not paid to vote, they do not go to the polls." (*Id.* ¶ 16 & Exs. A–B.) Plaintiffs assert:

> The real purpose of the 2005 Photo ID Act was and is to perpetuate and entrench control by the Republican Party over elections for state and federal offices at all levels in Georgia by making it easier for white voters to cast absentee ballots and by making it more difficult, if not impossible, for voters who are poor, elderly or infirm, to vote, and, most especially, to suppress the number of African–American and other minority voters.

(*Id.* ¶ 17.)

Secretary of State Cox informed the General Assembly and the Governor before the passage of the 2005 ID Act that the Act would open the door even wider to fraud in absentee balloting, while imposing a severe and unnecessary burden on the right to vote for hundreds of thousands of poor, elderly, and minority voters. (Second Am. Compl. ¶ 18 & Exs. C–D.) She noted that there had been no documented cases of fraudulent voting by persons who obtained ballots unlawfully by misrepresenting their identities as registered voters to poll workers reported to her office during her nine years as Secretary of State and that the greatest concern about fraudulent voting was with respect to absentee voting. (*Id.* ¶ 18 & Exs. C–D.)

Only one of forty-four African–American legislators in both houses of the General Assembly voted in favor of the 2005 Photo ID Act. (Second Am. Compl. ¶ 20.) In the House of Representatives, eighty-nine Republicans and two Democrats voted to approve the Act, while seventy-two Democrats and two Republicans voted against the Act. (*Id.* ¶ 19.) In turn, thirty-one Republicans in the Senate voted to approve the report of the Conference Committee on the Act, while eighteen Democrats and two Republicans voted against it. (*Id.*)

On April 22, 2005, Governor Sonny Perdue signed Act 53, and the Photo ID requirement of Act 53 became effective on July 1, 2005, subject to pre-clearance by the DOJ. (Second Am. Compl. ¶ 21.) On August 25, 2005, the career staff in the Voting Section of the DOJ recommended denial of preclearance for the mandatory Photo ID requirement in the 2005 Photo ID Act. (*Id.* ¶ 22 & Ex. A.) On August 26, 2005, the DOJ granted pre-clearance. (*Id.* ¶ 22 & Ex. E.)

At the same time that the General Assembly voted to require the presentation of a Photo ID for voting, the General Assembly also voted to amend O.C.G.A. § 40–5–103(a) to double the minimum fee for a Photo ID from $10 to $20 for a five-year Photo ID, and to authorize a new ten-

year Photo ID for $35. (Second Am. Compl. ¶ 23.) The General Assembly also voted to amend O.C.G.A. § 21–2–380(b) to make it easier for voters to obtain absentee ballots. (*Id.*)

After adopting Act 53, Georgia became one of only two states that requires registered voters to present a Photo ID as an absolute condition of being admitted to the polls and being allowed to cast a ballot in federal, state, and local elections. (Second Am. Compl. ¶ 24.) Twenty-six states do not require registered voters to present any form of identification as a condition of admission to the polls or to cast a ballot. (*Id.*) Twenty-four states require voters to present some form of identification of the polls. (*Id.*) Of those states requiring identification, only Georgia requires that voters present a Photo ID as the sole method of identification as a condition of voting, with no fail-safe alternative. (*Id.*)

### 5. The 2006 Photo ID Act

In January 2006, a majority of legislators in the Georgia House of Representatives and the Georgia Senate adopted the 2006 Photo ID Act. (Second Am. Compl. ¶ 27.) The 2006 Photo ID Act repealed the 2005 Photo ID Amendment, replacing it with identical Photo ID requirements for in-person voting and a new code section, O.C.G.A. § 21–2–417.1, which requires the Board of Elections in each county to issue a "Georgia voter identification card" containing a photograph of the voter, without charge to voters residing in the county, upon presentation of certain identifying documents. (*Id.*) The 2006 Photo ID Act amended O.C.G.A. § 40–5–103 by striking the previous subsection (d) in the 2005 Photo ID Act, which had required a voter to execute an affidavit of poverty to obtain a Photo ID without charge from the Department of Drivers Services ("DDS"). (*Id.* ¶ 28.) In its place, the 2006 Act sub-stituted a requirement that the voter swear "that he or she desires an identification card in order to vote ... and that he or she does not have any other form of identification that is acceptable under Code § 21–2–417" and to "produce evidence that he or she is registered to vote in Georgia." (*Id.*)

On January 9, 2006, the first day of the 2006 legislative session, the House Committee on Governmental Affairs of the Georgia House of Representatives approved SB 84 by a straight party-line vote of seven to three, sending the bill to the floor of the House. (Second Am. Compl. ¶ 29.) Before the full House considered SB 84, the Atlanta Journal Constitution published an article titled: "Registration in Georgia: Bogus Addresses Clutter Voter Registration Rolls." (Second Am. Compl. ¶ 32.) When SB 84 came up for a vote by the full House, the House did not address the issues of fraud in voter registration and in absentee voting. (*Id.* ¶ 33.) Plaintiffs contend that the manner in which the Georgia General Assembly passed SB 84 illustrates that the motivation behind the bill was purely partisan. (*Id.* ¶ 34.)

On January 24, 2006, the Senate passed SB 84. (Second Am. Compl. ¶ 35.) On January 25, 2006, the House of Representatives passed SB 84. (*Id.*) On January 26, 2006, Georgia's governor, Sonny Perdue, signed the Act. (*Id.*) The General Assembly refused to delay the effective date of the 2006 Photo ID Act until after the 2006 primary and general elections. (*Id.* ¶ 40.) On April 21, 2006, the DOJ precleared the 2006 Photo ID Act.

On January 29, 2006, the Atlanta Journal–Constitution published an article titled, "Absentee Voter Fraud Untouched by ID Law—Most Frequent Form of Cheating May be Eased by Recent Rules." (Second Am. Compl. ¶ 36 & Ex. G.)

Governor Perdue estimated that 300,000 Georgians do not have a driver's license or other acceptable photo identification for voting. (Second Am. Compl. ¶ 43 & Ex. H.) According to Plaintiffs, United States Department of Transportation data indicates that Georgia may have as many as 874,420 citizens of driving age who do not have driver's licenses. (*Id.* ¶ 43.) Plaintiffs contend that census data indicate that 390,414 Georgians of voting age and 242,949 Georgia households do not have access to a car or truck. (*Id.*) According to Plaintiffs, the census data further indicate that the median income of Caucasian households in Georgia is almost twice that of African–American households. (*Id.*) Additionally, according to the census data, twenty-eight percent of African–Americans and twenty-one percent of Hispanics in Georgia live in poverty, as compared to ten percent of Caucasians in Georgia. (*Id.*) The Census Bureau further reported that 140,000 African–American households in Georgia, as compared to 89,000 Caucasian households in Georgia, lacked access to a car. (*Id.*) Finally, the AARP and the League of Women Voters estimated that over 152,000 Georgians who voted in the 2004 general election were over sixty years of age and did not have a Georgia driver's license. (*Id.*)

### 6. The Statutes Modified or Enacted by the 2006 Photo ID Act

The 2006 Photo ID Act changed O.C.G.A. § 40–5–103(d)(1) to eliminate the affidavit of indigency requirement. That portion of the statute now provides:

The department shall not be authorized to collect a fee for an identification card from any person:

(1) Who swears under oath that he or she desires an identification card in order to vote in a primary or election in Georgia, and that he or she does not

have any other form of identification that is acceptable under Code Section 21–2–417 for identification at the polls in order to vote; and

(2) Who produces evidence that he or she is registered to vote in Georgia. This subsection shall not apply to a person who has been issued a driver's license in this state.

O.C.G.A. § 40–5–103(d).

The 2006 Photo ID Act also amended the text of O.C.G.A. § 21–2–417. O.C.G.A. § 21–2–417 currently provides:

(a) Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:

(1) A Georgia driver's license which was properly issued by the appropriate state agency;

(2) A valid Georgia voter identification card issued under Code Section 21–2–417.1 or other valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;

(3) A valid United States passport;

(4) A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A valid United States military identification card, provided that such

identification card contains a photograph of the elector; or

(6) A valid tribal identification card containing a photograph of the elector.

(b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21–2–418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21–2–419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

(c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21–2–200, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21–2–418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as

provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21–2–419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

O.C.G.A. § 21–2–417.

Finally, the 2006 Photo ID Act added O.C.G.A. § 21–2–417.1, which provides:

(a) Each county board of registrars shall provide at least one place in the county at which it shall accept applications for and issue Georgia voter identification cards to registered Georgia electors which shall under state law be valid only for purposes of voter identification under Code Section 21–2–417 and available only to registered electors of this state. No fee shall be charged or collected for the application for or issuance of a Georgia voter identification card.

(b) No person shall be eligible for a Georgia voter identification card if such person has a valid unexpired driver's license or identification card issued under Code Section 40–5–100.

(c) The Georgia voter identification card shall be captioned 'GEORGIA VOTER IDENTIFICATION CARD' and shall contain a prominent statement that under Georgia law it is valid only as identification for voting purposes. The Georgia voter identification card shall be laminated, shall contain a digital photograph of the applicant, and shall include the following information:

(1) Full legal name;

(2) Address of residence;

(3) Birth date;

(4) Date identification card was issued;

(5) Sex;

(6) Height;

(7) Weight;

(8) Eye Color;

(9) County where the identification card was issued including a county number to be assigned for each county by the Secretary of State; and

(10) Such other information or identification as required by rule of the State Election Board.

(d) The application for a Georgia voter identification card shall elicit the information required under subsection (c) of this Code section and such other information as may be required by rule of the State Election Board. The application shall be signed and sworn to by the applicant and any falsification or fraud in the making of the application shall constitute a felony offense under Code Section 16–10–71, relating to the offense of false swearing.

(e) The board of registrars shall require presentation and verification of the following information before issuing a Georgia voter identification card to a person:

(1) A photo identity document, except that a nonphoto identity document is acceptable if it includes both the person's full legal name and date of birth;

(2) Documentation showing the person's date of birth;

(3) Evidence that the person is registered to vote in this state; and

(4) Documentation showing the person's name and address of principal residence.

(f) A Georgia voter identification card shall remain valid so long as a person resides at the same address and remains qualified to vote. It shall be the duty of a person who moves his or her residence within the State of Georgia to surrender his or her card to the board of registrars of the county of his or her residence; and such person may after such surrender apply for and receive a new card if such person is otherwise eligible under this Code section. It shall be the duty of a person who moves his or her residence outside the State of Georgia or who ceases to be qualified to vote to surrender his or her card to the board of registrars by which it was issued.

(g) The State Election Board shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.

(h) The State Election Board shall adopt rules and regulations for the administration of this Code section and, without limiting the generality of the foregoing, such rules and regulations may further define or prescribe the types of documentation required under subsection (e) of this Code section.

O.C.G.A. § 21–2–417.1.

### 7. The Accompanying Rules and Regulations

On June 22, 2006, the State Board of Elections adopted rules and regulations to implement the 2006 Photo ID Act. The State submitted the rules and regulations to the DOJ for review, and the DOJ precleared the rules and regulations on June 27, 2006. The rules and regulations provide:

183–1–20.01 Georgia Voter Identification Card

(1) Intent and Purpose. These rules are promulgated pursuant to the authority granted the State Election Board under O.C.G.A. §§ 21–2–417.1 and 21–2–31. It is the intent of the State Election Board to provide for the time, place and manner in which each county Board of Registrars shall issue the Georgia Voter

Identification Card to eligible electors and to provide for the acceptable types of documentation necessary to obtain a Georgia Voter Identification Card. To this end, the State Election Board has promulgated these rules and regulations.

(2) Application for the Georgia Voter Identification Card. Beginning with the July 18, 2006 Party Primary Election each county registrar shall provide the application for the Georgia Voter Identification Card in the form designed and published by the State Election Board or its member designee(s). Any registered voter who meets the criteria in O.C.G.A. § 21–2–417.1 and wishes to obtain a Georgia Voter Identification Card shall be required to submit the information requested in such application. It shall be the responsibility of each county registrar to ensure that each accepted application is complete.

(3) Availability of the Georgia Voter Identification Card

(a) Each county shall provide a place within the voter registrar's primary or main office location, as previously approved by the Department of Justice, to process applications for Georgia Voter Identification Cards and to process and distribute such cards.

(b) Each county registrar's office may provide additional locations or extended hours for processing applications for the Georgia Voter Identification Card and processing and distributing the cards but shall be required to comply with criteria for establishment of additional voter registration places as outlined in 183–1–6–.03(3).

(c) Each county registrar's office shall be open a minimum of eight hours per day on Monday through Friday of the week before the final primary, election, or run-off election day, except for legally observed holidays, and shall otherwise be open during normal business hours of the office in order to allow registered voters to apply for and obtain a Georgia Voter Identification Card.

(d) The voter registrar's office of each county shall provide the application and process the Georgia Voter Identification Card using the equipment, forms, supplies, and written training materials and/or verbal training provided by the State Election Board.

(e) Each county Board of Registrars shall sign and maintain an intergovernmental agreement provided by the State Election Board outlining the use of the equipment.

(4) Documentation required for application and issuance of the Georgia Voter Identification Card.

(a) In accordance with O.C.G.A. § 21–2–417.1(e), the Board of Registrars shall require the presentation and verification of the following information before issuing a Georgia Voter Identification Card:

1. A photo identity document, except that nonphoto identity document is acceptable if it includes both the applicant's full legal name and date of birth;

2. Documentation showing the applicant's date of birth;

3. Evidence that the applicant is registered to vote in the State of Georgia, either by voter precinct card, a new voter registration application or confirmation of voter's record on the statewide voter registration system or by verifying the original application in the voter registrar's office; and

4. Documentation showing the applicant's name and principal residence address.

(b) In determining whether the requirements of O.C.G.A. § 21-2-417.1(e) have been met, the following shall apply:

1. Any of the following which contains a photograph of the applicant shall constitute a photo identity document, as provided in O.C.G.A. § 21-2-417.1(e)(1):

(i) Student ID Card including public or private high school, college, university, or vocational school;

(ii) Transit Card;

(iii) Pilot's License;

(iv) Nursing Home Identification Card;

(v) Employee Identification Card;

(vi) Government Housing Authority Identification Card;

(vii) Any government issued license;

(viii) Any card accepted by local, state or federal government for the provision of benefits; or

(ix) Any card accepted by local, state or federal government for access to buildings.

2. Any of the following shall constitute a nonphoto identity document in lieu of a photo identity document as provided in O.C.G.A. § 21-2-417.1(e)(1) only if it includes both the applicant's full legal name and date of birth:

(i) Original birth certificate or certified copy of birth certificate;

(ii) Certificate of birth registration;

(iii) Voter Registration Application;

(iv) Copy of records filed in court by the applicant or on behalf of the applicant by the applicant's counsel;

(v) Naturalization documents;

(vi) Copy of Marriage License Application;

(vii) A copy of the applicant's State or Federal Tax Return filed for the previous calendar year;

(viii) Any other document issued by local, state, or federal government so long as the document provides a reasonably reliable confirmation of the identity of the applicant;

(ix) Paycheck or paycheck stub bearing the imprinted name of the applicant's employer;

(x) An original of the annual social security statement received by the applicant for current or preceding calendar year;

(xi) An original of a Medicare or Medicaid statement received by the applicant;

(xii) Certified school record or transcript for current or preceding calendar year;

(xiii) Hospital birth certificate;

(xiv) An authenticated copy of a doctor's record of post-natal care; or

(xv) A federal Affidavit of Birth, form DS-10.

3. The registrar shall accept as documentation showing the applicant's date of birth under O.C.G.A. § 21-2-417.1(e)(2) any of the documents described in subparagraph (b)2 above.

4. The registrar shall accept as proof of voter registration under O.C.G.A. § 21-2-417.1(e)(3) the applicant's voter registration application or a voter's precinct card.

5. Any of the documents described in subparagraphs (b)(1) and (2) shall be acceptable as documentation showing the applicant's name and address of principal residence under O.C.G.A. § 21-2-417.1(e)(4) if the documentation contains the applicant's name and address of principal residence. In addition, the registrar shall also accept

the following as documentation showing the applicant's name and address of principal residence if the applicant's name and address of principal residence appears on the document:

(i) Voter Precinct Card;

(ii) Utility or cable bill issued within the last sixty (60) days;

(iii) Bank statement issued within the last sixty (60) days;

(iv) Currently valid rental contracts and/or receipts for payments made within the last sixty (60) days for rent payments;

(v) A copy of the applicant's State or Federal income tax return filed for the preceding calendar year;

(vi) Homeowners insurance policy or bill for current or preceding calendar year;

(vii) Mortgage, payment coupon, deed, or property tax bill for current or preceding calendar year;

(viii) Current Automobile Registration Receipt;

(ix) Homestead Exemption documentation; or

(x) W–2 for the preceding calendar year.

6. The application and supporting documentation of any applicant who is denied a Georgia Voter Identification Card shall be immediately forwarded via facsimile and U.S. mail to the State Election Board for automatic review to determine if the applicant has provided reasonably reliable documentary indicia confirming the identity of the applicant in which case the State Election Board shall direct the voter registrar to issue the Georgia Voter Identification Card.

## B. Evidence Submitted by the Parties

### 1. The October 18, 2005, Order

The Court's October 18, 2005, Order summarizes evidence presented by the parties and hearing testimony from the October 12, 2005, hearing relating to the 2005 Photo ID Act. The Court incorporates that portion of the October 18, 2005, Order into this Order.

### 2. Exhibits to Plaintiffs' Second Motion for Preliminary Injunction

Plaintiffs submitted as Exhibit B to their Second Motion for Preliminary Injunction the Secretary of State NEWS for June 19, 2006. In that release, the Secretary of State's Office reported that a database match between the State's file of registered voters and the DDS data file of persons issued valid Georgia driver's licenses or Georgia ID cards revealed that 676,246 registered voters either had no record of a driver's license or ID issued, or had their licenses revoked, suspended, canceled, denied, or surrendered.

Plaintiffs submitted as Exhibit C to their Second Motion for Preliminary Injunction the Secretary of State NEWS for June 23, 2006. In that document, the Secretary of State's Office indicated that nearly one-fourth of all registered voters aged sixty-five or over did not have a driver's license or Georgia ID card, and that 33.2 percent of African–American registered voters over age sixty-five did not have a license or Georgia ID. Nearly three-fourths of the voters who lacked driver's licenses or Georgia ID cards were on the active voter roll, meaning that they had voted during the last two election cycles. Although African–Americans comprised 27.8 percent of the voter roll, they represented 35.6 percent of those lacking a driver's license or Georgia ID card.

Plaintiffs attached an April 2, 2005, article from the *Atlanta Journal–Constitution* titled, "Voter ID Bill Likely to Be Law," as Exhibit G to their Second Motion for Preliminary Injunction. The article states that Governor Perdue estimated that 300,-000 Georgians 18 or over did not have a driver's license or Photo ID.

Plaintiffs attached as Exhibit I to their Second Motion for Preliminary Injunction a June 30, 2006, article from the *Atlanta Journal–Constitution* titled, "Voter ID Cards Can Be Issued." That article states, in relevant part:

> The Election Board also agreed to spend $211,00 on a voter education campaign. The money will go toward running 30–second radio spots before and after the July primary, creation of an informational brochure after the primary and the production of a two-page letter handed to voters at the polls in July after they vote—all aimed at telling voters to bring photo ID to cast a ballot.
>
> David Worley, the Democratic appointee to the State Election Board, unsuccessfully tried to get the board to mail a letter to some 676,000 people the secretary of state's office identified as registered voters having neither a driver's license nor an identification card.
>
> "It accomplishes nothing to hand it to them after voting on Election Day," Worley said.

(Pls.' Second Mot. Prelim. Inj. Ex. I.)

Plaintiffs attached as Exhibit J to their Second Motion for Preliminary Injunction the DOJ Section 5 Recommendation Memorandum dated August 25, 2005, concerning the 2005 Photo ID Act. That memorandum recommends denying preclearance to the 2005 Photo ID Act because the 2005 Photo ID Act would unduly burden minority voters.

### 3. Would–Be Voter Declarations Submitted by Plaintiffs

Plaintiffs have submitted a number of declarations from would-be voters who assert that the 2006 Photo ID Act will affect them. A number of the voters do not drive or cannot afford a car. (Decl. of Annie Johnson ¶ 7; Second Decl. of Eleanor Whittenburg ¶ 4; Decl. of George Cliatt ¶ 7; Decl. of Irene Laster ¶ 7; Decl. of Larry Dewberry ¶ 7; Decl. of Minnie Bridges ¶ 7; Decl. of Pearl Kramer ¶ 6; Decl. of Rosa Brown ¶ 7.)

Most of the voters do not have a driver's license, passport, tribal Photo ID, or other form of government-issued ID because they have no need for one in their day-to-day lives. (A. Johnson Decl. ¶¶ 4, 7; E. Whittenburg Second Decl. ¶ 4; G. Cliatt Decl. ¶¶ 4, 7; I. Laster Decl. ¶¶ 4, 7; L. Dewberry Decl. ¶¶ 4–7; M. Bridges Decl. ¶¶ 4, 7; P. Kramer Decl. ¶¶ 4, 6; R. Brown Decl. ¶¶ 4, 7.) Quite a few of the voters are African–American. (A. Johnson Decl. ¶ 5; G. Cliatt Decl. ¶ 5; I. Laster Decl. ¶ 5; L. Dewberry Decl. ¶ 5; M. Bridges Decl. ¶ 5; R. Brown Decl. ¶ 5.) Many of the voters are over sixty-five years old. (A. Johnson Decl. ¶ 1 (seventy-six years old); E. Whittenburg Second Decl. ¶ 1 (will be eighty-five years old on her next birthday); G. Cliatt Decl. ¶ 4 (seventy-four years old); I. Laster Decl. ¶ 1 (eighty-eight years old); M. Bridges Decl. ¶ 1 (eighty-six years old); P. Kramer Decl. ¶ 1 (eighty-one years old); R. Brown Decl. ¶ 1 (seventy-four years old).)

Several of the voters have physical or mental disabilities that make it difficult for them to travel to a registrar's office or a DDS center, to walk for long distances, or to stand in line. (A. Johnson Decl. ¶ 7 (has difficulty taking a bus or walking long distances); E. Whittenburg Second Decl. ¶ 1 (legally blind and walks with assistance of a walker); G. Cliatt Decl. ¶ 7 (poor

health and cannot walk long distances); I. Laster Decl. ¶ 7 (arthritis); M. Bridges Decl. ¶ 7 (diabetic and walks with assistance of a walker); P. Kramer Decl. ¶ 6 (visual impairments); R. Brown Decl. ¶ 7 (legally blind).) Others have to rely on family members or friends for transportation, or cannot obtain public transportation to a registrar's office or DDS service center. (A. Johnson Decl. ¶ 7; E. Whittenberg Second Decl. ¶ 1 (must rely on family for transportation; closest family member is thirty-five miles away); L. Dewberry Decl. ¶ 7; M. Bridges Decl. ¶ 7; P. Kramer Decl. ¶ 6; R. Brown Decl. ¶ 7.)

Many of the voters stated that the registrar's offices in their respective counties were several miles from their respective polling places, or that they did not know where their respective registrar's offices were located. (A. Johnson Decl. ¶ 7; G. Cliatt Second Decl. ¶ 7; I. Laster Decl. ¶ 7; L. Dewberry Decl. ¶ 7; M. Bridges Decl. ¶ 7; P. Kramer Decl. ¶ 6; R. Brown Decl. ¶ 7.) A number of the voters expressed a preference for voting in person or a distrust of the absentee voting process. (A. Johnson Decl. ¶ 10; Second Decl. of Clara Williams ¶¶ 4–7; E. Whittenburg Second Decl. ¶ 6; G. Cliatt Decl. ¶ 10; I. Laster Decl. ¶ 10; L. Dewberry Decl. ¶ 10; M. Bridges Decl. ¶ 10; P. Kramer Decl. ¶ 9; R. Brown Decl. ¶ 10.)

Another voter described problems that she and a group of individuals experienced when attempting to access the GLOW bus and in attempting to obtain information concerning the GLOW bus schedule. (Decl. of Martina Robinson ¶¶ 4–13.)

### 4. Declarations of Politicians

Plaintiffs have submitted declarations from Dubose Porter and Tyrone Brooks, Sr., Democratic members of the Georgia House of Representatives, and Sam Zamarripa, a Democratic member of the Georgia Senate. (Decl. of Dubose Porter ¶ 2; Decl. of Tyrone Brooks, Sr. ¶ 2; Decl. of Sam Zamarripa ¶ 2.) According to Representative Porter and Senator Zamarripa, political motivations inspired the passage of the 2006 Photo ID Act, which was passed in response to the Court's October 18, 2005, Order enjoining the 2005 Photo ID Act. (D. Porter Decl. ¶¶ 3–4; S. Zamarripa Decl. ¶¶ 3–4.) Representative Porter and Senator Zamarripa contend that the legislature passed the 2006 Photo ID Act in an extremely partisan manner. (D. Porter Decl. ¶¶ 6–8; S. Zamarripa Decl. ¶¶ 8–12.)

Representative Brooks states that voters have expressed distrust of absentee voting, noting that their ballots may not be counted and that their ballots may not be handled in a way that will protect the secrecy of their votes. (T. Brooks Decl. ¶ 3.) Representative Brooks believes that those concerns discourage voters from using absentee voting. (*Id.*)

### 5. Declarations from Jennifer Owens

Jennifer Owens is the Executive Director of the League of Women Voters of Georgia. (Decl. of Jennifer Owens ¶ 2; Second Decl. of Jennifer Owens ¶ 2.) Her responsibilities include serving as a registered lobbyist for the League of Women Voters, working on voting rights and voter education issues at the Georgia General Assembly. (J. Owens First Decl. ¶ 2; J. Owens Second Decl. ¶ 2.) She served in that capacity during the 2006 General Assembly session. (J. Owens First Decl. ¶ 2; J. Owens Second Decl. ¶ 2.) She also monitors the proceedings of the State Election Board. (J. Owens First Decl. ¶ 2; J. Owens Second Decl. ¶ 2.)

Ms. Owens attended the State Election Board meetings held on September 26, 2005, October 4, 2005, October 21, 2005, December 14, 2005, January 18, 2006, Jan-

uary 31, 2006, March 8, 2006, March 20, 2006, May 17, 2003, June 22, 2006, June 19, 2006, and June 29, 2006. (J. Owens First Decl. ¶ 3; J. Owens Second Decl. ¶ 3.) Ms. Owens observed all proceedings at those meetings other than those proceedings held in closed-door executive sessions. (J. Owens First Decl. ¶ 3; J. Owens Second Decl. ¶ 3.) Ms. Owens does not recall any discussion of a specific case or matter relating to in-person fraudulent voting, or any specific discussion of facts or circumstances that might give rise to such a case or matter. (J. Owens First Decl. ¶ 3; J. Owens Second Decl. ¶ 3.) Instead, the majority of cases brought before the State Election Board related to fraud in absentee voting and in voter registration. (J. Owens First Decl. ¶ 3; J. Owens Second Decl. ¶ 3.)

Based on her experience, Ms. Owens believes that efforts relating to educating voters about SB 84 should be substantial and will require a significant amount of time. (J. Owens First Decl. ¶ 4.) Ms. Owens believes that the current education efforts are insufficient. (Id. ¶ 5.)

According to Ms. Owens, the State plans to educate voters by handing voters a letter describing the 2006 Photo ID Act's requirements after the voters arrive at the polls, and purchasing radio spots on a network. (J. Owens Second Decl. ¶ 4.) The radio network only reaches 900,000 adults, not all of whom live in Georgia. (Id.) The board rejected other educational proposals and voted not to spend all of the money that the legislature had appropriated for public education. (Id.)

According to Ms. Owens, the State Election Board discussed several educational proposals at its June 29, 2006, meeting. (J. Owens Second Decl. ¶ 5.) The Board rejected a mailing to the potential 675,000 individuals identified by the Secretary of State's office as lacking a Georgia driver's license or State-issued Photo ID card. (Id.) The Board reasoned that the list of such voters was questionable, and that mailing an education piece to those voters would validate the accuracy of the list. (Id.)

The State Election Board also approved a plan to purchase radio advertisements about the 2006 Photo ID Act's Photo ID requirement through an existing State contract. (J. Owens Second Decl. ¶ 6.) The contract includes approximately 100 radio stations; however, the contractor informed the Board that the stations have a combined estimated listener base of 900,-000 adults, including listeners in Alabama, Florida, South Carolina, and Tennessee. (Id.)

The legislature appropriated approximately $211,000 specifically for voter education. (J. Owens Second Decl. ¶ 7.) The legislature allocated a separate equipment budget of over $1 million to cover the cost of purchasing and implementing the machines in each county. (Id.) According to Ms. Owens, on June 19, 2006, $38,965 was moved from the education budget to cover additional costs associated with the purchase of the equipment. (Id.) Ms. Owens further states that the estimated cost of the letters to be distributed to precincts on Election Day Is $53,869, plus an additional $3,000 in costs for purchasing and shipping paper to counties outside the Atlanta metropolitan area to allow those counties to make their own copies of the letter. (Id.)

**6. Declaration of Ron Hockensmith**

Ron Hockensmith is the chief librarian for Bondurant, Mixon and Elmore, LLP. (Decl. of Ron Hockensmith ¶ 2.) On May 31, 2006, the law firm requested documents from the Georgia Department of Administrative Services ("DOAS") regarding the bid proposals and contract for providing the equipment necessary to issue

the voter ID cards. (*Id.* ¶ 3 & Ex. 1.) In response to that request, DOAS provided the law firm with a CD–ROM containing electronic copies of the contract and bid proposal. (*Id.* ¶ 4 & Ex. 2.)

Exhibit 3 to Mr. Hockensmith's Declaration consists of excerpts from the contract between The Police and Sheriffs Press, Inc. and the State Election Board for the Voter ID card equipment. (R. Hockensmith Decl. ¶ 5 & Ex. 3.) Exhibit 4 to Mr. Hockensmith's Declaration consists of excerpts from The Police and Sheriffs Press, Inc.'s response to DOAS's request for proposals. (*Id.* ¶ 6 & Ex. 4.)

On May 21, 2006, the law firm requested documents relating to the study done by the Secretary of State to determine the number of registered voters who lack Photo IDs issued by DDS. (R. Hockensmith Decl. ¶ 7 & Ex. 5.) The Secretary of State's Office provided the law firm with copies of documents, audio CDs of State Election Board Meetings, and a CD–Rom. (*Id.* ¶ 8 & Ex. 6.) Exhibit 7 to Mr. Hockensmith's Declaration is a copy of spreadsheets concerning active and inactive voters who were not matched to the DDS records. (*Id.* ¶ 9 & Ex. 7.) Exhibit 8 to Mr. Hockensmith's Declaration consists of e-mails to and from members of the Secretary of State's staff concerning the DDS data-matching study. (*Id.* ¶ 10 & Ex. 8.) Exhibit 9 to Mr. Hockensmith's Declaration is a copy of the transcript of the audio CD of the June 22, 2006, State Election Board meeting. (*Id.* ¶ 11 & Ex. 9.)

Exhibit 3 to Mr. Hockensmith's declaration states that the contract includes "[u]p to 10,000 delivered Voter Identification Cards." (R. Hockensmith Decl. Ex. 3 at 3.) Any additional Voter ID cards will cost $7.00 per card. (*Id.* at 3–4.)

Exhibit 9 consists of a transcript from the June 22, 2006, State Election Board meeting. In the hearing, the Secretary of State's Office recommended using direct mail to notify affected voters. (R. Hockensmith Decl. Ex. 9 at 7–8.) The Secretary of State's Office indicated that the timing of printing and mailing the piece to the voters, however, likely would prevent the piece from arriving until one day before or even after the July 18, 2006, primary. (*Id.* at 11–12.) The transcript also indicates that the 676,246 number reported by the Secretary of State's Office does not represent the number of people who do not have an acceptable form of Photo ID under SB 84, and that the Secretary of State's Office did not intend for the number to do so. (*Id.* at 30, 55.) Instead, that number represents voters who are eligible for a Voter ID card. (*Id.* at 31–32.) The hearing questions and answers also indicate that the 676,246 number may include individuals who have died. (*Id.* at 34.)

### 7. Declaration of Sheryl Gowen

On July 6, 2006, Plaintiffs filed a Motion for Leave to File the Declaration of Sheryl Gowen, which the Court granted on July 7, 2006. (Order of July 7, 2006.) Dr. Gowen currently serves as the Chairperson of the Department of Educational Policy Studies in the College of Education at Georgia State University. (Decl. of Sheryl Gowen ¶ 2.) She previously served as the Assistant Director of Georgia State University's Center for the Study of Adult Literacy, as well as the Chairperson of Georgia State University's Department of Learning Support Programs. (*Id.*) She has more than fifteen years of experience in testing and evaluating individuals' reading abilities. (*Id.*)

Dr. Gowen holds a Ph.D. in Communicative Arts Curriculum and Instruction. (S. Gowen Decl. ¶ 4.) According to Dr. Gowen, that is the highest degree available in her field of study. (*Id.*)

Dr. Gowen has authored, or co-authored, over fifteen book chapters, journal articles, newsletters, and reports addressing illiteracy and numeracy. (S. Gowen Decl. ¶ 5.) Dr. Gowen also has given over thirty speeches and presentations concerning subjects and issues relating to literacy. (*Id.*)

According to Dr. Gowen, the United States Department of Education, National Center for Education Policy, published the results of its National Literacy Study ("NALS") in 1993. (S. Gowen Decl. ¶ 6.) The NALS data indicate that twenty-three percent of all adults in Georgia are at Level One literacy, or below basic literacy. (*Id.* ¶ 7.) Those adults possess no more than the most simple and concrete literacy skills. (*Id.*) The NALS data also indicate that another thirty-one percent of adults in Georgia function at Level Two literacy, or basic literacy. (*Id.* ¶ 8.) Those adults can perform only simple and everyday literacy tasks. (*Id.*)

In 2003, the United States Department of Education conducted the National Assessment of Adult Literacy ("NAAL") to measure the changes in adult literacy levels between 1992 and 2003. (S. Gowen Decl. ¶ 10.) According to Dr. Gowen, the NAAL results indicate that the adult population had not significantly improved its literacy skills in prose and documentary literacy. (*Id.*)

Based on the above information, Dr. Gowen opines that more than half of all Georgians read below the tenth grade level. (S. Gowen Decl. ¶ 11.) Dr. Gowen has evaluated the readability of the absentee ballot application, and has opined that the absentee ballot application had a readability level of tenth grade, according to the Flesch–Kincaid Readability Index. (*Id.* ¶¶ 12–14.) According to Dr. Gowen, that level is well above the reading level of fifty-four percent of the adult population in Georgia. (*Id.* ¶ 14.) Stated differently, Dr. Gowen believes that less than forty percent of adults in Georgia are capable of reading and comprehending the absentee ballot application. (*Id.*) Dr. Gowen further opined that fifty-four percent of the adults in Georgia are estimated to function at a level of literacy well below the literacy skills required to comprehend the absentee ballot application, and over half of all Georgia adults could not read, comprehend, and complete the application without assistance. (*Id.* ¶¶ 15–16.)

### 8. Declarations from Local Elections Officials

#### a. Declaration of John M. Payne

Defendant John M. Payne has served as the Probate Judge and Elections Superintendent for Chattooga County, Georgia, for thirty-one years. (Decl. of Jon M. Payne ¶ 2.) In his time as an election officer, Mr. Payne has never seen evidence of in-person voter fraud. (*Id.* ¶ 3.) Mr. Payne believes that it would be very difficult for a person to commit in-person voter fraud in Chattooga County because Chattooga County has a small population and the poll workers know most of the voters. (*Id.*) Mr. Payne believes that if in-person voter fraud had occurred, it would have come to his attention. (*Id.* ¶ 4.) Mr. Payne thinks that in-person voter fraud would be easy to detect because most voters are well-known to the poll workers, and it would be likely that the real voter would later come to the polls, be informed he was listed as already voted, and report that fact to election officials. (*Id.*)

Mr. Payne does not believe that in-person voter fraud exists as a problem in Chattooga County. (J. Payne Decl. ¶ 5.) Mr. Payne does not believe that requiring voters to obtain a Voter ID card would do anything to combat in-person voter fraud.

(*Id.*) A person could show the same documentation to the registrar to obtain a Voter ID card that he or she could show under the previous law to vote in-person. (*Id.*) Mr. Payne does not believe that showing the same documentation in the Registrar's office is a more reliable way to identify a voter than showing the same documentation at the polling place. (*Id.*) Mr. Payne notes that the precinct workers are more familiar with people in their local areas than the Registrar's office workers are, and it probably is more reliable to have the precinct workers identify the voters before they vote. (*Id.* ¶ 7.)

Mr. Payne believes that a number of voters in Chattooga County do not have Photo ID cards, and will have to travel to the registrar's office to obtain a Voter ID card. (J. Payne Decl. ¶ 8.) Mr. Payne believes that it is especially difficult for people in the rural areas and smaller towns of Chattooga County to come to the registrar's office in Summerville, which is substantially farther from their homes than their normal voting precincts. (*Id.*)

Since the 2006 Photo ID Act went into effect, Chattooga County has issued only two Voter ID cards. (J. Payne Decl. ¶ 9.) Mr. Payne believes that voters have not come in to obtain Voter ID cards because they do not know about the 2006 Photo ID Act's Photo ID requirement. (*Id.*) In Mr. Payne's experience, a massive education effort is required to get information to voters concerning changes in voting procedure, and the State has not made such an effort concerning the 2006 Photo ID Act. (*Id.*)

Mr. Payne believes that given the large number of voters who might need a Voter ID card, his office cannot provide Voter ID cards to all voters who need those before the November election. (J. Payne Decl. ¶ 10.) According to Mr. Payne, his office cannot provide enough Voter ID cards to the voters who require those before the July 18, 2006, primary election. (*Id.*) Mr. Payne believes that requiring voters who do not have an approved form of Photo ID to obtain a Photo ID in order to vote in person will discourage many voters from voting at all. (*Id.* ¶ 11.)

### b. Declaration of Gloria W. Champion

Gloria W. Champion is the Executive Director of the Fulton County Department of Voter Registration and Elections, which is supervised by the Fulton County Board of Registration and Elections (the "Fulton Board"). (Decl. of Gloria W. Champion ¶ 2.) Ms. Champion has served in that position for six and one-half years, and previously served as the Elections Supervisor for the Fulton Board. (*Id.*)

As Executive Director, Ms. Champion generally supervises all election activities under the jurisdiction of the Fulton Board within Fulton County, including voter registration, assigning voters to precincts, maintaining registration records, conducting primary, run-off, and general elections, and federal, state, county, and municipal elected offices in which residents of Fulton County are entitled to vote in accordance with the Georgia election code, answering questions concerning election officials and election districts, compiling election statistics, and operating all polling locations for federal, state, county, and municipal elections. (G. Champion Decl. ¶ 3.)

In-person absentee voting began on June 2, 2006. (G. Champion Decl. ¶ 4.) Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 3, 2006, Fulton County had 168 in-person absentee voters, none of whom lacked a Photo ID. (*Id.* & Ex. 1.)

As of July 3, 2006, Fulton County had mailed out 3,708 absentee ballots, including 1,807 Democratic ballots and 1,651 Republican ballots. (G. Champion Decl. ¶ 5.) Fulton County has received 374 Democratic ballots and 359 Republican ballots. (*Id.*)

Early voting was scheduled to begin on July 10, 2006. (G. Champion Decl. ¶ 6.) Late in the afternoon of July 7, 2006, the Fulton Board received notification that an injunction had been issued prohibiting the Photo ID requirement, and that the Fulton Board should return to the old law. (*Id.*) The Fulton Board can make appropriate adjustments for advance voting this week because the voting is taking place at only three locations: the main office and the North and South service centers. (*Id.* ¶ 7.)

Ms. Champion's office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and her staff have received training concerning producing the cards. (G. Champion Decl. ¶ 8.) Fulton County's main office and its North and South service centers all have equipment, supplies, and personnel to issue the Voter ID cards. (*Id.*) Each of its offices has a set of equipment, including a camera, a computer, and a printer, to produce Voter ID cards, which the State Election Board provided. (*Id.*) Fulton County also has ordered an additional unit for traveling to nursing homes and other locations to issue Voter ID cards for people who may need a Voter ID card but who may have some difficulty in traveling to one of Fulton County's three offices or to a DDS service center. (*Id.* ¶ 9.)

Fulton County trained employees in each office concerning the use of the equipment to produce the Voter ID card. (G. Champion Decl. ¶ 10.) Fulton County's offices began issuing the Voter ID cards on June 30, 2006. (*Id.*) As of July 10, 2006, Fulton County had issued a total of twenty-nine cards. (*Id.*) Fulton County can issue as many temporary Voter ID cards, which are good for forty-five days, as necessary. (*Id.*)

Ms. Champion's office only received a few calls concerning Voter ID cards. (G. Champion Decl. ¶ 11.) Most calls came from voters who already have driver's licenses but who think they also need a Voter ID card. (*Id.*) When the office receives those calls, the office inquires whether the caller has another form of acceptable Photo ID. (*Id.*) If the caller has another form of acceptable Photo ID, the office advises the caller to use that ID. (*Id.*) If the caller lacks another form of acceptable Photo ID, the office advises the caller concerning how to obtain a Voter ID card. (*Id.*) The office also advises the callers about the availability of no-excuse mail-in absentee voting without a Photo ID, and instructs the callers concerning how to obtain an absentee ballot. (*Id.*) Given the minimal number of inquiries and the few number of callers who lack a Photo ID, Ms. Champion believes that Fulton County has more than sufficient equipment and personnel to fulfill requests for Voter ID cards. (*Id.* ¶ 12.)

According to Ms. Champion, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (G. Champion Decl. ¶ 13.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Ms. Champion, such a process: (1) depends on the computer system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Ms. Champion's office does signature comparison for absentee ballots, absentee ballots require fewer compari-

sons, two original signatures are available for comparison, and the registrar's office can compare signatures as the absentee ballots are received. (*Id.*)

Any voter who requests an absentee ballot via a writing that contains sufficient information for Ms. Champion's office to verify the voter's address and to determine that the voter is a registered voter receives an absentee ballot. (G. Champion Decl. ¶ 14.) Fulton County is "completely current on mailing out absentee ballots," and, if a voter submitted a written request for an absentee ballot today, Fulton County would mail an absentee ballot to that voter today. (*Id.* ¶ 16.)

Ms. Champion further states that no automatic updating of the voter registration rolls occurs on a regular basis. (G. Champion Decl. ¶ 15.) The State can delete deceased voters based on reports generated by the Vital Records Department, using file management; however, each county is responsible for updating its rolls on the statewide system. (*Id.*) The process for updating the rolls varies by county. (*Id.*)

### 9. Declaration of Linda W. Latimore

Linda W. Latimore is the Director of the DeKalb County Voter Registration and Election Office, and has served in that position for thirteen years. (Decl. of Linda W. Latimore ¶ 2.) She previously served as the absentee ballot clerk in charge of absentee balloting for DeKalb County. (*Id.*)

As Director, Ms. Latimore generally supervises all election activities conducted by DeKalb County, including voter registration, assigning voters to precincts, maintaining registration records, conducting primary, run-off, and general elections, and federal, state, county, and municipal elected offices in accordance with the Georgia election code, answering questions concerning election officials and election districts, compiling election statistics, and operating all polling locations for federal, state, county, and municipal elections. (L. Latimore Decl. ¶ 3.) After the 2006 Voter ID Act passed and the DOJ precleared it, Ms. Latimore's office ordered new election materials from the Elections Division for use during the July 18, 2006, primary, including voter certificates and posters for the polling places that explain the six forms of acceptable Photo ID. (*Id.* ¶ 4.) Although the Elections Division also provided Ms. Latimore's office with the documentation for conducting an election under the old law, her office has made all of its preparations such as training and voter information under the 2006 Photo ID Act. (*Id.*) In particular, Ms. Latimore's office conducted staff training and poll worker training under the 2006 Photo ID Act, and does not have sufficient time to conduct another poll worker training. (*Id.* ¶ 4(a).) Ms. Latimore's office also made efforts to educate the public concerning the Photo ID requirement for in-person voting, using press releases and news conferences. (*Id.* ¶ 4(b).) Although Ms. Latimore's office has received very few telephone calls concerning the Photo ID requirements, her office consistently has answered those questions using the new law. (*Id.* ¶ 5(c).)

In-person absentee voting began on June 2, 2006. (L. Latimore Decl. ¶ 5.) Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 3, 2006, DeKalb County had 571 in-person absentee voters, none of whom lacked a Photo ID. (*Id.*)

As of July 3, 2006, DeKalb County had mailed out 8,923 absentee ballots. (L. Latimore Decl. ¶ 6.) DeKalb County has received 2,235 Democratic ballots and 1,414 Republican ballots. (*Id.*)

Early voting was scheduled to begin on July 10, 2006. (L. Latimore Decl. ¶ 7.) Late in the afternoon of July 7, 2006, Ms. Latimore's office received notification that an injunction had been issued prohibiting the Photo ID requirement, and that her office should return to the old law. (*Id.*) Ms. Latimore can make appropriate adjustments for advance voting this week because the voting is taking place at only six locations: the main office and five satellite offices. (*Id.* ¶ 8.)

Ms. Latimore's office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and her staff have received training concerning producing the cards. (L. Latimore Decl. ¶ 9.) Ms. Latimore's office has two sets of equipment, including a camera, a computer, and a printer, to produce Voter ID cards, as well as a second set of equipment on order. (*Id.* ¶ 10.) DeKalb County has supplies to make an unlimited number of Voter ID cards, and has an additional machine to produce Voter ID cards that is mobile for use in locations such as nursing homes. (*Id.*)

As of July 10, 2006, DeKalb County had issued a total of seventeen cards. (L. Latimore Decl. ¶ 11.) Ms. Latimore believes that the equipment already provided by the State will be sufficient to fulfill the anticipated requests for Voter ID cards. (*Id.*) Ms. Latimore's office has received approximately forty telephone calls inquiring about the process Voter ID cards. (*Id.* ¶ 11.)

According to Ms. Latimore, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (L. Latimore Decl. ¶ 14.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Ms. Latimore,

such a process: (1) depends on the computer system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Ms. Latimore's office does signature comparison for absentee ballots, absentee ballots require fewer comparisons, two original signatures are available for comparison, and the registrar's office can compare signatures as the absentee ballots are received. (*Id.*)

DeKalb County receives absentee ballot applications on a regular basis, and Ms. Latimore has not noted problems with voters being unable to complete the applications correctly. (L. Latimore Decl. ¶ 15.) In any event, a voter need not complete an application form to obtain an absentee ballot. (*Id.*) Any voter who requests an absentee ballot via a writing that contains sufficient information for Ms. Latimore's office to verify the voter's address and to determine that the voter is a registered voter receives an absentee ballot. (*Id.*)

Ms. Latimore further states that no automatic updating of the voter registration rolls occurs on a regular basis. (L. Latimore Decl. ¶ 13.) The State can delete deceased voters based on reports generated by the Vital Records Department, using file management; however, each county is responsible for updating its rolls on the statewide system. (*Id.*) The process for updating the rolls varies by county. (*Id.*)

Finally, Ms. Latimore states that if the Court issues a preliminary injunction for the July 18, 2006, primaries, tremendous confusion for election officials, poll workers, and voters would result. (L. Latimore Decl. ¶ 16.)

### 10. Second Declaration of Lynn Bailey

Ms. Bailey is the Executive Director of the Richmond County Board of Elections,

and has served in that capacity since 1993. (Second Decl. of Lynn Bailey ¶ 2.) As Executive Director, Ms. Bailey supervises all Richmond County elections, as well as elections for municipalities in Richmond County, including Augusta, Blythe, and Hephzibah. (*Id.*)

After the 2006 Voter ID Act passed and the DOJ precleared it, Ms. Bailey's office ordered new election materials from the Elections Division for use during the July 18, 2006, primary, including voter certificates and posters for the polling places that explain the six forms of acceptable Photo ID. (L. Bailey Second Decl. ¶ 3.) The Elections Division also provided Ms. Bailey's office with the documentation for conducting an election under the old law. (*Id.*) Ms. Bailey's office conducted staff training and poll worker training under the 2006 Photo ID Act and under the old law. (*Id.* ¶ 4(a).) Ms. Bailey's office also made efforts to educate the public concerning the Photo ID requirement for in-person voting, using speaking engagements and media outlets. (*Id.* ¶ 4(b).)

In-person absentee voting began on June 5, 2006. (L. Bailey Second Decl. ¶ 4.) Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 7, 2006, Richmond County had ninety-four in-person absentee voters, none of whom lacked a Photo ID. (*Id.*)

As of July 7, 2006, Richmond County had mailed out 647 absentee ballots, including 371 Democratic ballots and 276 Republican ballots. (L. Bailey Second Decl. ¶ 5.) Richmond County has received 55 Democratic ballots and 54 Republican ballots. (*Id.*)

Early voting was scheduled to begin on July 10, 2006. (L. Bailey Second Decl. ¶ 6.) Late in the afternoon of July 7, 2006, Ms. Bailey's office received notification that an injunction had been issued prohibiting the Photo ID requirement, and that the office should return to the old law. (*Id.*) Richmond County has three sites for advance voting, and has swapped the forms at all three sites so that the forms on hand reflect the types of identification allowed under the old law. (*Id.* ¶ 7.) The injunction is the subject of an emergency appeal, and, if another change occurs, Ms. Bailey's office will continue to use media sources to help educate the public concerning that change. (*Id.* ¶ 8.)

Ms. Bailey's office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and her staff have received training concerning producing the cards. (L. Bailey Second Decl. ¶ 8.) Ms. Bailey's office has a set of equipment, including a camera, a computer, and a printer, to produce Voter ID cards, which the State Election Board provided. (*Id.*) Based on the demand for Voter ID cards, Ms. Bailey does not anticipate needing additional equipment. (*Id.*) Her office has access to supplies to make an unlimited number of temporary Voter ID cards. (*Id.*)

Ms. Bailey's office has not received complaints concerning voters' inability to obtain Photo ID. (L. Bailey Second Decl. ¶ 11.) The majority of voters in Richmond County use a driver's license or state ID card to identify themselves at the polls. (*Id.*) As of July 17, 2006, Richmond County had issued forty-five Voter ID cards. (*Id.*)

According to Ms. Bailey, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (L. Bailey Second Decl. ¶ 12.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Ms. Bailey, such a process: (1) depends on the computer

system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Ms. Bailey's office does signature comparison for absentee ballots, absentee ballots require fewer comparisons, two original signatures are available for comparison, and the registrar's office can compare signatures as the absentee ballots are received. (*Id.*)

Richmond County receives absentee ballot applications on a registered basis, and Ms. Bailey has not noted problems with voters being unable to complete the applications correctly. (L. Bailey Second Decl. ¶ 13.) In any event, a voter need not complete an application form to obtain an absentee ballot. (*Id.*) Any voter who requests an absentee ballot via a writing that contains sufficient information for Ms. Bailey's office to verify that the voter is eligible to receive an absentee ballot is mailed an absentee ballot. (*Id.*) Ms. Bailey believes that evidence of in-person voting fraud would be difficult to find, because there is no set way to track an alleged impersonator after he or she leaves the polling place. (*Id.*)

Ms. Bailey states that making changes in the poll laws and procedures this close to an election is very confusing to workers and voters. (L. Bailey Second Decl. ¶ 14.) If the Court issues a preliminary injunction, there will not be sufficient time before the July 18, 2006, primary to offer additional poll worker training. (*Id.*) Instead, Ms. Bailey's office will inform its poll managers of any changes, and will depend on the poll managers to inform their poll workers of the changes. (*Id.*)

### 11. Second Declaration of Lynn Ledford

Lynn Ledford is the Elections Supervisor for Gwinnett County, Georgia, and has served in that position for four years. (Second Decl. of Lynn Ledford ¶ 2.) Gwinnett County has the second largest population in Georgia and is one of the fastest growing counties in the United States. (*Id.*) Gwinnett County has approximately 360,000 registered voters, and has more municipalities than any other county in Georgia. (*Id.*) In her capacity as Elections Supervisor, Ms. Ledford supervises all Gwinnett County elections, and serves as the official registrar of voters for municipalities in Gwinnett County. (*Id.* ¶ 3.)

After the 2006 Voter ID Act passed and the DOJ precleared it, Ms. Ledford's office ordered new election materials from the Elections Division for use during the July 18, 2006, primary, including voter certificates and posters for the polling places that explain the six forms of acceptable Photo ID. (L. Ledford Second Decl. ¶ 4.) Ms. Ledford's staff also attended training sessions conducted by the Elections Division, including training concerning the 2006 Photo ID Act's requirements and issuance of Voter ID cards. (*Id.*)

In-person absentee voting began on June 2, 2006. (L. Ledford Second Decl. ¶ 5.) Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 3, 2006, Gwinnett County had 389 in-person absentee voters, none of whom lacked a Photo ID. (*Id.* & Ex. A.)

As of July 7, 2006, Gwinnett County had mailed out a number of absentee ballots, including 738 Democratic ballots and 2427 Republican ballots, and has received 234 Democratic ballots and 756 Republican ballots. (L. Ledford Second Decl. ¶¶ 6–7.)

Early voting was scheduled to begin on July 10, 2006. (L. Ledford Second Decl. ¶ 7.) Late in the afternoon of July 7, 2006, Ms. Ledford's office received notification that an injunction had been issued prohib-

iting the Photo ID requirement, and that her office should return to the old law. (*Id.*) Ms. Ledford's office can make appropriate adjustments for advance voting this week because the voting is taking place at only three locations: the main office and the North and South service centers. (*Id.* ¶ 8.)

Ms. Ledford's office understands that the State court's injunction is the subject of an emergency appeal. (L. Ledford Second Decl. ¶ 9.) If the injunction is overturned or another change is made, it is very likely that some polling places may require a Photo ID for in-person voting, while other polling places will apply the old law. (*Id.*) The injunction or any change will result in tremendous confusion at the polls. (*Id.*)

Ms. Ledford's office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and her staff have received training concerning producing the cards. (L. Ledford Second Decl. ¶ 10.) Ms. Ledford's office has a set of equipment, including a camera, a computer, and a printer, to produce Voter ID cards. (*Id.*) Ms. Ledford's staff received training concerning the use of the machinery that produces the Voter ID cards. (*Id.* ¶ 11.)

Gwinnett County began issuing Voter ID cards on Friday, June 30, 2006. (L. Ledford Second Decl. ¶ 11.) As of July 7, 2006, Gwinnett County had issued a total of three cards. (*Id.*) Ms. Ledford states that her office has the capacity to make an unlimited number of temporary Voter ID cards, which are valid for forty-five days. (*Id.*)

Ms. Ledford also states that her office has received no complaints indicating that voters cannot obtain a Photo ID. (L. Ledford Second Decl. ¶ 13.) Ms. Ledford's office has received only a few telephone calls concerning Voter ID cards, and most of those calls have come from voters who have driver's licenses but think they also need a Voter ID card. (*Id.*) When Ms. Ledford's employees receive such calls, they ask whether the caller has another form of Photo ID. (*Id.*) If the caller has another acceptable form of Photo ID, Ms. Ledford's employees advise the caller to use that ID. (*Id.*) If the caller does not have an acceptable form of Photo ID, Ms. Ledford's employees give the caller information concerning how to obtain a Voter ID card. (*Id.*) Ms. Ledford's employees also advise the callers concerning the availability of no-excuse absentee voting by mail that does not require a Photo ID. (*Id.*) Ms. Ledford's office answers the calls by explaining the new law, not the old law. (*Id.* ¶ 14.) Based on the minimal number of calls that her office has received, the fact that the majority of the callers already have an acceptable form of Photo ID, and her experience in Gwinnett County, Ms. Ledford believes that the equipment and personnel that her office has is more than sufficient to fulfill any requests for the Voter ID cards. (*Id.* ¶ 15.)

According to Ms. Ledford, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (L. Ledford Second Decl. ¶ 16.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Ms. Ledford, such a process: (1) depends on the computer system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Ms. Ledford's office does signature comparison for absentee ballots, absentee ballots require fewer comparisons, two original signatures are available for comparison, and the registrar's office

can compare signatures as the absentee ballots are received. (*Id.*)

Gwinnett County receives absentee ballot applications on a regular basis, and Ms. Ledford has not noted problems with voters being unable to complete the applications correctly. (L. Ledford Second Decl. ¶ 17.) In any event, a voter need not complete an application form to obtain an absentee ballot. (*Id.*) Any voter who requests an absentee ballot via a writing that contains enough information for Ms. Ledford's office to determine that the voter is a registered voter and to be able to mail the ballot receives an absentee ballot. (*Id.*)

Ms. Ledford further states that no automatic updating of the voter registration rolls occurs on a regular basis. (L. Ledford Second Decl. ¶ 18.) The State can delete deceased voters based on reports generated by the Vital Records Department, using file management; however, each county is responsible for updating its rolls on the statewide system. (*Id.*) The process for updating the rolls varies by county. (*Id.*)

Ms. Ledford opines that the 2006 Photo ID Act will not disenfranchise any voter, because voters who lack Photo ID can vote a provisional ballot and provide identification within two business days or vote via absentee ballot by mail. (L. Ledford Second Decl. ¶ 19.)

Finally, Ms. Ledford states that if the Court issues a preliminary injunction for the July 18, 2006, primaries, tremendous confusion for election officials, poll workers, and voters would result. (L. Ledford Second Decl. ¶ 20.)

**12. Second Declaration of Gary Smith**

Gary Smith is the Director of Elections and Registration for the Forsyth County Board of Elections in Cumming, Georgia, and has served in that position since January 1, 2002. (Second Decl. of Gary Smith ¶ 2.) In his capacity as Director of Elections, Mr. Smith supervises all Forsyth County elections, and serves as the official registrar of voters for municipalities in Forsyth County. (*Id.*)

After the 2006 Voter ID Act passed and the DOJ precleared it, Mr. Smith's office ordered new election materials from the Elections Division for use during the July 18, 2006, primary, including voter certificates and posters for the polling places that explain the six forms of acceptable Photo ID. (G. Smith Second Decl. ¶ 3.) Mr. Smith's staff also attended training sessions conducted by the Elections Division, including training concerning the 2006 Photo ID Act's requirements and the issuance of Voter ID cards. (*Id.* ¶ 3(a).) Mr. Smith's office conducted poll training under the 2006 Photo ID Act, and does not have sufficient time to conduct another poll worker training before the July 18, 2006, primary. (*Id.*)

Mr. Smith's office also has made efforts to educate the public concerning the Photo ID requirement. (G. Smith Second Decl. ¶ 3(b).) Mr. Smith's office sent a letter to every voter in the general election who did not show one of the acceptable forms of Photo ID. (*Id.* & Ex. 1.) The letter advised those voters of the change in the law and the need to obtain a·proper Photo ID. (*Id.*) Mr. Smith's office also has met with Senior Center citizens, published articles in the local newspapers, placed mailings in water bills, and provided website information. (*Id.*) Mr. Smith's office has received very few calls concerning the Photo ID requirements, but has answered those calls by explaining the new law, rather than the old law. (*Id.* ¶ 3(c).)

In-person absentee voting began on June 5, 2006. (G. Smith Second Decl. ¶ 4.)

Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 7, 2006, Forsyth County had 119 in-person absentee voters, none of whom lacked a Photo ID. (*Id.*)

As of July 7, 2006, Forsyth County had mailed out 414 absentee ballots, including 70 Democratic ballots and 344 Republican ballots. (G. Smith Second Decl. ¶ 5.) Forsyth County has received 19 Democratic ballots and 105 Republican ballots. (*Id.*)

Early voting was scheduled to begin on July 10, 2006. (G. Smith Second Decl. ¶ 6.) Late in the afternoon of July 7, 2006, Mr. Smith's office received notification that an injunction had been issued prohibiting the Photo ID requirement, and that his office should return to the old law. (*Id.*) Mr. Smith's office can make appropriate adjustments for advance voting this week because the voting is taking place at only three locations: the Public Safety complex and the two libraries. (*Id.* ¶ 7.) Mr. Smith's office does not have time to conduct a new training for poll workers. (*Id.*)

Mr. Smith's office understands that the State court's injunction is the subject of an emergency appeal. (G. Smith Second Decl. ¶ 8.) If the injunction is overturned or another change is made, it is very likely that some polling places may require a Photo ID for in-person voting, while other polling places will apply the old law. (*Id.*) The injunction or any change will result in tremendous confusion at the polls. (*Id.*)

Mr. Smith office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and his staff have received training concerning producing the cards. (G. Smith Second Decl. ¶ 8.) Mr. Smith's office has a set of equipment, including a camera, a computer, and a printer, to produce Voter ID cards. (*Id.*) As of July 7, 2006, Forsyth County had issued a total of three cards. (*Id.* ¶ 11.)

Mr. Smith also states that his office has received no complaints indicating that voters cannot obtain a Photo ID. (G. Smith Second Decl. ¶ 11.) Mr. Smith's office has received only a few telephone calls concerning Voter ID cards, and most of those calls have come from voters who have driver's licenses but think they also need a Voter ID card. (*Id.*)

According to Mr. Smith, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (G. Smith Second Decl. ¶ 17.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Mr. Smith, such a process: (1) depends on the computer system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Mr. Smith's office does signature comparison for absentee ballots, absentee ballots require fewer comparisons, two original signatures are available for comparison, and the registrar's office can compare signatures as the absentee ballots are received. (*Id.*)

Forsyth County receives absentee ballot applications on a regular basis, and Mr. Smith has not noted problems with voters being unable to complete the applications correctly. (G. Smith Second Decl. ¶ 13.) In any event, a voter need not complete an application form to obtain an absentee ballot. (*Id.*) Any voter who requests an absentee ballot via a writing that contains sufficient information for Mr. Smith's office to determine that the voter is a registered voter and to be able to mail the ballot receives an absentee ballot. (*Id.*)

Mr. Smith further states that no automatic updating of the voter registration

rolls occurs on a regular basis. (G. Smith Second Decl. ¶ 14.) Each county is responsible for maintaining its own list, including deleting deceased voters, voters who are no longer eligible to vote because they have moved, are serving a sentence for a felony, or have been adjudicated incompetent. (*Id.*) The process for updating the rolls varies by county. (*Id.*)

Mr. Smith opines that the 2006 Photo ID Act will benefit voters by preventing their votes from being diluted by invalid votes due to in-person voter fraud, which Mr. Smith believes can be accomplished easily. (G. Smith Second Decl. ¶¶ 15–16.) According to Mr. Smith, the 2006 Photo ID Act's provisions assist his office in preventing the opportunity for an invalid vote after a fraudulent registration. (*Id.* ¶ 18.) Mr. Smith states that he reported six fraudulent voter registrations to the Forsyth County District Attorney's Office last year. (*Id.*) According to Mr. Smith, only one other opportunity exists to prevent the fraudulent registrants from casting invalid ballots—prohibiting them from voting at the polling places when they do not have correct identification. (*Id.*)

Mr. Smith further opines that the 2006 Photo ID Act's requirements benefit voters and the public by promoting public confidence in elections. (G. Smith Second Decl. ¶ 19.) Mr. Smith believes that the limitation on the number of forms of acceptable identification is especially helpful to the poll workers in Forsyth County, all of whom are part-time employees and many of whom change from election to election. (*Id.* ¶ 20.) Mr. Smith opines that photo identification is necessary to identify voters in Forsyth County, which has a large population and is a mobile community, as the poll workers do not know many of the voters by sight. (*Id.* ¶ 21.)

Finally, Mr. Smith states that if the Court issues a preliminary injunction for the July 18, 2006, primaries, tremendous confusion for election officials, poll workers, and voters would result. (G. Smith Second Decl. ¶ 22.) In particular, Mr. Smith's office cannot conduct another poll worker training, which Mr. Smith believes would be essential because the poll workers already have received training under the 206 Photo ID Act. (*Id.*)

### 13. Second Declaration of Shea Hicks

Shea Hicks is the Chairperson of the Gordon County Board of Elections and Voter Registration (the "GBRE") and has served in that position since 2001. (Second Decl. of Shea Hicks ¶ 2.) In her capacity as Chairperson, Ms. Hicks supervises all Gordon County elections, as well as elections for municipalities in Gordon County, including Fairmount, Ranger, Resaca, and Plainville. (*Id.*) When requested, the GBRE also assists the City of Calhoun with its elections. (*Id.*)

After the 2006 Voter ID Act passed and the DOJ precleared it, Ms. Hick's office ordered new election materials from the Elections Division for use during the July 18, 2006, primary, including voter certificates and posters for the polling places that explain the six forms of acceptable Photo ID. (Shea Hicks Second Decl. ¶ 3.) Ms. Hicks' staff also attended training sessions conducted by the Elections Division, including training concerning the 2006 Photo ID Act's requirements and the issuance of Voter ID cards. (*Id.* ¶ 3(a).) Ms. Hicks' office conducted poll worker training under the 2006 Photo ID Act, and does not have sufficient time to conduct another poll worker training before the July 18, 2006, primary. (*Id.*)

Ms. Hicks' office also has made efforts to educate the public concerning the Photo

ID requirement. (S. Hicks Second Decl. ¶ 3(b).) Ms. Hicks' office provided information to the newspaper, which published a story containing information about the 2006 Photo ID Act. (*Id.*) Ms. Hicks' office has received very few calls concerning the Photo ID requirements, but has answered those calls by explaining the new law, rather than the old law. (*Id.* ¶ 3(c).)

In-person absentee voting began on June 7, 2006. (S. Hicks Second Decl. ¶ 4.) Voters who used in-person absentee voting were required to present Photo ID, and all did so. (*Id.*) As of July 7, 2006, Gordon County had seventy-three in-person absentee voters, none of whom lacked a Photo ID. (*Id.*)

As of July 7, 2006, Gordon County had mailed out 210 absentee ballots, including 127 Democratic ballots and 83 Republican ballots. (S. Hicks Second Decl. ¶ 5.) Gordon County has received 82 Democratic ballots and 36 Republican ballots. (*Id.*)

Early voting was scheduled to begin on July 10, 2006. (S. Hicks Second Decl. ¶ 6.) Late in the afternoon of July 7, 2006, Ms. Hicks' office received notification that an injunction had been issued prohibiting the Photo ID requirement, and that her office should return to the old law. (*Id.*) Ms. Hicks' office can make appropriate adjustments for advance voting this week because the voting is taking place at only one location: Ms. Hicks' office. (*Id.* ¶ 7.) Ms. Hicks, however, will have to give notice to all of the poll workers who will be working at the polls on July 18, 2006. (*Id.*)

Ms. Hicks' office understands that the State court's injunction is the subject of an emergency appeal. (S. Hicks Second Decl. ¶ 8.) If the injunction is overturned or another change is made, it is very likely that some polling places may require a Photo ID for in-person voting, while other polling places will apply the old law. (*Id.*)

The injunction or any change will result in tremendous confusion at the polls. (*Id.*)

Ms. Hicks' office is fully equipped with the machine, supplies, and personnel needed to issue the Voter ID cards, and her staff have received training concerning producing the cards. (S. Hicks Second Decl. ¶ 9.) Ms. Hicks' office has a set of equipment, including a camera, a computer, and a printer, to produce Voter ID cards. (*Id.*) Based on the extremely low demand for the Voter ID cards in Gordon County, Ms. Hicks does not anticipate needing additional equipment. (*Id.*) Ms. Hicks' office has supplies to make an unlimited number of temporary Voter ID cards. (*Id.*) As of July 7, 2006, Gordon County had not issued a Voter ID card. (*Id.* ¶ 11.)

Ms. Hicks also states that her office has received no complaints indicating that voters cannot obtain a Photo ID. (S. Hicks Second Decl. ¶ 11.) Ms. Hicks' office has received inquiries concerning Voter ID cards; however, those calls have come from voters who have driver's licenses but think they also need a Voter ID card. (*Id.*) The great majority of voters in Gordon County already use either a driver's license or a state-issued ID card to identify themselves at the polls. (*Id.*)

According to Ms. Hicks, using signature comparison to identify voters at the polls is not reasonable or feasible at the present time. (S. Hicks Second Decl. ¶ 12.) No such mechanism currently is in place, and implementing one would be very costly and would result in a time-consuming process that would create long lines at the polls. (*Id.*) According to Ms. Hicks, such a process: (1) depends on the computer system working without fail and on poll workers having good computer skills; (2) assumes the quality of the reproduction is good; and (3) is very time-consuming. (*Id.*) Although Ms. Hicks' office does sig-

nature comparison for absentee ballots, absentee ballots require fewer comparisons, two original signatures are available for comparison, and the registrar's office can compare signatures as the absentee ballots are received. (*Id.*)

Gordon County receives absentee ballot applications on a regular basis, and Ms. Hicks has not noted problems with voters being unable to complete the applications correctly. (S. Hicks Second Decl. ¶ 13.) In any event, a voter need not complete an application form to obtain an absentee ballot. (*Id.*) Any voter who requests an absentee ballot via a writing that contains sufficient information for Ms. Hicks' office to determine that the voter is a registered voter and to be able to mail the ballot receives an absentee ballot. (*Id.*)

Finally, Ms. Hicks states that if the Court issues a preliminary injunction for the July 18, 2006, primaries, tremendous confusion for election officials, poll workers, and voters would result. (S. Hicks Second Decl. ¶ 20.)

### 14. Depositions

#### a. Deposition of Kathy A. Rogers

Ms. Rogers is the Director of Elections for the Secretary of State's Office. (Dep. of Kathy A. Rogers at 3.) She has been employed with Secretary of State's Office since May 2002. (*Id.* at 4.)

According to Ms. Rogers, each county usually has one person as a full-time employee in the registrar's office. (K. Rogers Dep. at 8.) The registrar's office in a given county may have other part-time employees. (*Id.*) All of the registrars have offices in public buildings. (*Id.*) Some registrars have satellite offices for absentee voting periods, but most generally have one main office for the bulk of the year. (*Id.*) Registrar's offices are required to be open during regular business hours, which

may vary from county to county. (*Id.* at 9.)

The Secretary of State's Office has provided information to elections and registration officials concerning the 2006 Photo ID Act and the passage of the 2006 Photo ID Act, its status, and its preclearance. (K. Rogers Dep. at 10.) The Secretary of State's Office discussed those matters at the Georgia Elections Officials Conference in early April 2006. (*Id.*) The Secretary of State's Office planned to give more specific detailed information to the registrars at the Georgia Voter's Registrar's Conference, scheduled to be held from May 22 through May 24, 2006. (*Id.* at 11.) Attendance at one of those events is mandatory for registrars. (*Id.*)

The new regulations from the State Election Board were in the mail to registrars as of May 8, 2006, the date of Ms. Rogers' deposition. (K. Rogers Dep. at 13.) Registrars who had signed up to receive electronic communications received the rules by e-mail during the preceding week. (*Id.*) A number of registrars are not signed up to use the electronic services. (*Id.*)

At the Voter Registrar's Conference, the vendor of the Voter ID card equipment was to send representatives to demonstrate the equipment to the registrars. (K. Rogers Dep. at 14, 64.) The vendor was to have responsibility for the training. (*Id.* at 18.) More than one attendee per county likely will come to the conference; however, each county decides which staff members to send to the conference. (*Id.* at 64.)

The 2006 Photo ID Act contemplates providing one piece of Voter ID equipment to a county, regardless of population size. (K. Rogers Dep. at 17, 61.) Ms. Rogers does not know whether any county plans to purchase other equipment by the July 18, 2006, primary election. (*Id.* at 17, 61.)

The decision to purchase extra equipment would be made on a county-by-county basis. (*Id.* at 61–62.) The State will not provide funding to staff the equipment. (*Id.* at 17.)

The touch-screen voting change involved significantly more training and education, and the State provided significantly more funding. (K. Rogers Dep. at 18–20.) The State has anticipated funding the education effort for the 2006 Photo ID Act through funds provided to the State Election Board and through the office of the Secretary of State. (*Id.* at 20.) The Secretary of State's Office will provide material to local registrars for reproduction and distribution within counties. (*Id.*)

At present, the Secretary of State's Office has one statewide voter education coordinator and three regional voter education coordinators. (K. Rogers Dep. at 21.) In 2002, it had twelve regional voter education coordinators plus a statewide voter education coordinator. (*Id.*)

The Secretary of State's Office has no particular line item budget available for the education effort for the 2006 Photo ID Act; however, it does have a small budget available. (K. Rogers Dep. at 22.) The State did not provide additional funds to the Secretary of State's Office for the education effort. (*Id.* at 23.) The Secretary of State's Office anticipates working with the State Elections Board to assist it in determining the most effective manner to expend the $250,000 that the legislature provided to the State Election Board for voter education. (*Id.*)

In 2005, the State Election Board received no reports of fraud involving someone impersonating a voter for in-person voting. (K. Rogers Dep. at 24.) It received complaints concerning fraud in the absentee balloting process. (*Id.* at 24–26.) It also received complaints of fraudulent voter registrations. (*Id.* at 26.)

Individuals who register to vote by mail and who are voting for the first time must show identification to vote absentee. (K. Rogers Dep. at 27.) Such identification can consist of a utility bill or a bank statement. (*Id.*) Individuals who registered to vote in person do not have to present identification to vote absentee. (*Id.* at 30.)

To obtain a Voter ID card, a voter can present a utility bill issued within the last sixty days. (K. Rogers Dep. at 31.) The voter also can present a voter registration application, which the registrar should have in its records. (*Id.* at 33.) So long as a voter can show his or her date of birth, full legal name, and residence, all of which should be contained on the voter registration application, the voter would not need to show additional documentation to get a Voter ID card. (*Id.* at 34.)

A voter may present a paycheck from his or her employer to obtain a Voter ID card. (K. Rogers Dep. at 34–35.) A voter also can present census records or an early school record. (*Id.* at 35.) Additionally, voters can present a doctor's record of post-natal care or a copy of a State or Federal income tax return. (*Id.* at 40, 48–49.) A voter may present a bank statement or a landlord's receipt acknowledging receipt of rent for a room that shows the voter's name and address. (*Id.* at 51.) Essentially, a voter may show a combination of documents, but must establish his or her date of birth, legal name, and principal address. (*Id.*) A voter also must show that he or she is registered to vote; however, this information should be in the registrar's possession. (*Id.* at 36.)

Voters may use their voter precinct cards to get a Voter ID card. (K. Rogers Dep. at 41.) Those cards are mailed to the voters and are not in the registrar's possession. (*Id.* at 41, 43.) The registrars do not maintain copies of the cards, but in-

stead simply maintain records showing that the cards were mailed and the dates of mailing. (*Id.* at 43.)

Voter registration applications remain on file with the registrar. (K. Rogers Dep. at 44.) The voter registration applications contain the signatures that the registrar is supposed to consult when verifying the accuracy of absentee ballots. (*Id.*)

A voter can use his or her voter registration application to get a Voter ID card, and a voter can register to vote without presenting identification. (K. Rogers Dep. at 51.) To obtain a Voter ID card, a voter must sign an application affirming that he is in fact the registered voter and that he does not have a Georgia driver's license or Georgia-issued State ID card. (*Id.* at 51–52.) If he does so, he can get a Voter ID card without showing photo ID. (*Id.*) He then can use the Voter ID card to vote in person. (*Id.* at 52.)

Ms. Rogers has no information from the vendor concerning the processing time required to produce a Voter ID card, but believes the time would be very brief. (K. Rogers Dep. at 56.) She does not know how many Voter ID cards a single machine can produce in one day. (*Id.* at 59.)

Individuals applying for a Voter ID card must complete a form. (K. Rogers Dep. at 57.) The number of staff in registrar's offices inputting forms varies. (*Id.*) During absentee voting, however, the offices generally have more staff. (*Id.* at 58.) The State is not providing more money for staffing to implement the 2006 Photo ID Act. (*Id.* at 58.)

The regulations allow a registrar's office to be open extra hours, so long as the registrar follows the statute requiring preclearance by the DOJ. (K. Rogers Dep. at 59.) The registrar's office are required to remain open a minimum of eight hours per day on Monday through Friday of the week prior to the election. (*Id.*) Otherwise, the offices are to be open during regular business hours. (*Id.*) Some offices maintain extended hours during the week or at satellite locations. (*Id.* at 60.)

### b. Deposition of Cathy Cox

Secretary of State Cathy Cox testified that the November 2005 general elections did not require Photo ID. (Dep. of Cathy Cox Dated May 8, 2006, at 4.) Secretary of State Cox is not aware of any complaints of fraudulent in-person voting from those elections. (*Id.* at 5.) In fact, during her tenure as Secretary of State and Assistant Secretary of State, she has not received a complaint of in-person voter impersonation. (*Id.* at 43.) She believes that the system previously in place weeds out opportunities for voter fraud and has been effective so far. (*Id.* at 45–46.)

Secretary of State Cox is aware of complaints of fraudulent absentee voting relating to the November 2005 elections. (May 8, 2006, C. Cox Dep. at 5–6.)

Secretary of State Cox knows of no legislation introduced during the 2006 legislative session to address fraudulent voter registration. (May 8, 2006, C. Cox Dep. at 8–9.) The legislature made no attempts to prevent fraud in absentee voting during that session. (*Id.* at 12.)

The State Election Board waited until after the DOJ precleared the 2006 Photo ID Act on April 21, 2006, to adopt rules and regulations under the Act. (May 8, 2006, C. Cox Dep. at 14–15.) The State Election Board did not have authority to adopt rules and regulations under the 2006 Photo ID Act until the DOJ precleared it. (*Id.* at 15.)

The State Election Board proposed the rules and regulations for adoption on May 2, 2006, but because of notice and public hearing requirements, it could not adopt

the rules and regulations until June 1, 2006, after a public hearing. (May 8, 2006, C. Cox Dep. at 13–14, 17.) Those rules and regulations also required DOJ pre-clearance. (*Id.* at 14, 17.)

The Secretary of State's Office requested money to purchase equipment for the Voter ID cards and to conduct voter education efforts. (May 8, 2006, C. Cox Dep. at 17.) The Secretary of State's Office informed the legislature of its 2002 efforts to educate voters concerning touch-screen voting. (*Id.* at 17–18.)

The budget proposed by the Secretary of State's Office contemplated purchasing one piece of equipment per county, regardless of population. (May 8, 2006, C. Cox Dep. at 19.) Some metropolitan counties asked whether they could purchase additional equipment. (*Id.*) The legislature eventually gave the Secretary of State's Office $550,000 for equipment. (*Id.* at 20.)

In 2002, the Secretary of State's Office had thirteen voter education coordinators. (May 8, 2006, C. Cox Dep. at 24.) Today, it has four, due to budget cuts. (*Id.*) The legislature did not give the Secretary of State's Office funding to hire additional education coordinators for the 2006 Photo ID Act voter education effort. (*Id.* at 25.) Instead, the legislature allocated $250,000 to the State Election Board for voter education and training. (*Id.*)

In her deposition, Secretary of State Cox could not explain the rationale for the theory that the Photo ID requirement prevents fraudulent in-person voting. (May 8, 2006, C. Cox Dep. at 29.) Secretary of State Cox also stated that she knew of no reason why a Photo ID should make a difference or prevent any fraud in the context of in-person voting. (*Id.* at 53.)

To register to vote, a voter need not present any of the identification required under the rules and regulations under the 2006 Photo ID Act to get a Voter ID card. (May 8, 2006, C. Cox Dep. at 30.) For absentee voting, a voter other than a first-time voter who registered by mail, does not have to present any form of identification set forth in the 2006 Photo ID Act and the accompanying rules and regulations. (*Id.*)

Secretary of State Cox does not know the exact number of people in Georgia who lack Photo IDs. (May 8, 2006, C. Cox Dep. at 31.) The AARP has estimated that approximately 300,000 senior citizens in Georgia do not have driver's licenses and may be impeded by the new statute. (*Id.*)

Secretary of State Cox does not recall that the legislature considered the literacy level of the Georgia population when it considered the changes to the absentee voting rules and the Photo ID requirement. (May 8, 2006, C. Cox Dep. at 37.) To vote absentee successfully, a voter must be able to read instructions, sign in the appropriate places, fold the ballot, put the ballot in the correct envelope, and make the right type of attestations to have the ballot accepted. (*Id.* at 38.) The instructions are fairly detailed and require a number of steps to complete the ballot, to mail the ballot to the registrar, and to time the mailing of the ballot so that the registrar receives it by the deadline. (*Id.*) Over 311,000 Georgians have less than a ninth-grade education level of reading, and whether those individuals could vote absentee would depend on whether they had done so previously. (*Id.* at 39.) Secretary of State Cox does not know whether a voter who cannot read above level 1 could vote absentee successfully. (*Id.*)

An analysis indicates that more Republican absentee ballots than Democratic absentee ballots are voted during primaries. (May 8, 2006, C. Cox Dep. at 40.) Secretary of State Cox contends that eliminating the absentee ballot requirements opens the

floodgates to absentee voting fraud. (*Id.* at 44–45.)

The primary means of verification for absentee voting is to compare the signature on the envelope of the ballot to the signature on file in the registrar's office from the original voter registration. (May 8, 2006, C. Cox Dep. at 47.) Under the previous law, in-person voters who did not have identification completed an oath similar to the oath for an absentee ballot envelope. (*Id.* at 48.) Registrars certainly could compare signatures to verify identification for in-person voting; however, doing so would be very difficult because the voter registration cards are not at the polling places. (*Id.*) Ideally, the voter registration cards should stay in the registrars' offices. (*Id.* at 49.)

Secretary of State Cox testified that the 2006 Photo ID Act is subject to the same criticisms as the 2005 Photo ID Act. (May 8, 2006, C. Cox Dep. at 51.) Although Photo ID presumably will be available in more locations, it still will be difficult for the elderly, poor, sick, and those without automobiles or driver's licenses to obtain one. (*Id.*) The new Photo ID requirement will pose a hardship for many voters, particularly those in remote areas. (*Id.* at 52.) Even if a place for obtaining a Photo ID is in the voter's county, obtaining one will be difficult if the voter has no transportation. (*Id.* at 53.)

### 15. Declaration of Thomas Blake Ussery

Thomas Blake Ussery is a Redistricting Services Specialist in the Office of Legislative and Congressional Reapportionment. (Decl. of Thomas Blake Ussery ¶ 2.) That office provides technical support for redistricting actions by the General Assembly, and, upon a request by the Legislature, also provides technical assistance for local government redistricting plans. (*Id.*)

Since 2001, Mr. Ussery has provided assistance to legislators in drawing maps for redistricting plans. (*Id.*)

Mr. Ussery's office uses Maptitude, a redistricting software. (T. Ussery Decl. ¶ 3.) When doing redistricting work, Mr. Ussery often must locate particular addresses on a map of the State or on a map of a particular jurisdiction within the State. (*Id.*) Mr. Ussery uses the Maptitude software to geocode the location of the addresses. (*Id.*) Specifically, he enters the address, and Maptitude uses a database of streets with numbered ranges of addresses to pinpoint the specific location of a physical address or a location within a certain address range. (*Id.*) Maptitude then makes a geographic representation of the location with a star or other symbol. (*Id.*)

Mr. Ussery used Maptitude to create the map attached as Exhibit 1 to his Declaration. (T. Ussery Decl. ¶ 4.) The map reflects the addresses of DDS service centers, as well as the locations of the Georgia registrar's offices. (*Id.* ¶¶ 5–7.) According to Mr. Ussery, the map indicates that in Fulton and Dekalb counties, voters have seven locations in which they can obtain Photo ID cards for voting: three DDS service centers in Fulton County, two DDS service centers in Dekalb County, and one registrar's office in each county. (*Id.* ¶ 7.)

### 16. Declaration of Claud L. McIver III

Claud L. McIver is the Vice–Chair of the Georgia State Board of Elections, and has been a member of the State Election Board since July 2005. (Decl. of Claud L. McIver III ¶ 2.) Mr. McIver supported the 2006 Photo ID Act. (*Id.* ¶ 3.) The Georgia General Assembly passed the 2006 Photo ID Act during its 2006 Regular Session. (*Id.* ¶ 4.) The General Assembly appropriated $800,000 to the State Election Board

to provide for: (a) the installation of the equipment to allow every county voter registrar's office to produce a Voter ID card; (b) the training for the registrars to operate the equipment; and (c) voter education. (*Id.*) Mr. McIver states that the State Election Board has carried out those functions, and continues to do so. (*Id.*) According to Mr. McIver, the amount appropriated by the General Assembly is sufficient to accomplish those functions. (*Id.*)

After the 2006 Photo ID law was passed and the DOJ precleared it, the State Election Board appointed Mr. McIver to oversee the tasks necessary to ensure that the counties received the machinery, supplies, training, and support to produce and distribute the Voter ID cards. (C. McIver Decl. ¶ 5.) To provide the counties with the necessary equipment, forms, supplies, and training to produce the Voter ID cards, the State Election Board approved a vendor to provide the equipment, supplies, training, and support to the counties, and purchased those items and services from the vendor. (*Id.* ¶ 5(a).) The equipment is installed and is operational in every county registrar's office. (*Id.*) As of July 6, 2006, the registrar's offices in Georgia had issued a total of eighty-three Voter ID cards. (*Id.*)

The contract with the vendor provides that the vendor must allow the State Election Board and all counties to purchase additional machines at the same price charges for the first unit, or for approximately $3,500 each. (C. McIver Decl. ¶ 5(a).) Several of Georgia's large counties have ordered additional units. (*Id.*)

The State Election Board also approved a form for applicants to complete to obtain a Voter ID card. (C. McIver Decl. ¶ 5(b).) Every registrar's office in Georgia has a supply of the forms. (*Id.*)

The State Election Board also has completed the training of the registrars by holding a mass training session at the Voter Registrars Association of Georgia's meeting on May 22 through May 24, 2006. (C. McIver Decl. ¶ 5(c).) Representatives from 157 of Georgia's 159 counties attended that meeting. (*Id.*) Many counties also received on-site training from the vendor. (*Id.*) The State Election Board also purchased two additional Voter ID machines to conduct additional training at the Secretary of State's Office and to serve as loaners if necessary. (*Id.*)

The 2006 Photo ID Act also required the State Election Board to adopt procedures for the application and issuance of the cards. (C. McIver Decl. ¶ 7.) The State Election Board accordingly adopted rules, which it submitted to the DOJ for preclearance. (*Id.* & Ex. 1.) In adopting rules and in determining the type of documentation necessary to obtain a Voter ID card, the State Election Board considered the types of identifying documents that voters might have readily available and that registrars could identify easily. (*Id.* ¶ 8.)

Mr. McIver states that the registrars all have knowledge of the documents that voters may present to obtain a Voter ID card, and that the registrars can and have provided that information to voters by telephone. (C. McIver Decl. ¶ 9(a).) Mr. McIver further notes that all registrars are producing the Voter ID cards at their offices, and that some larger counties are making the Voter ID card available at satellite locations as well. (*Id.* ¶ 9(b).) Additionally, according to Mr. McIver, some counties plan to use a mobile unit to produce Voter ID cards. (*Id.*) Mr. McIver stated that no fees are necessary to obtain a Voter ID card, and indicates that all voters who are eligible for a Voter ID card can use copies of documents that do not cost the voters anything and that are

readily available to the voters, such as a Medicare statement or a Social Security statement, to obtain the Voter ID card. (*Id.* ¶ 9(c).) Mr. McIver observes that the counties can issue replacement voter registration cards to voters who have lost those cards, but notes that a voter does not need a voter registration card to obtain a Voter ID card. (*Id.* ¶ 9(d).)

The State Election Board met on June 29, 2006, after the DOJ precleared the rules on June 27, 2006. (C. McIver Decl. ¶ 10.) At the June 29, 2006, meeting, the State Election Board instructed the Elections Division of the Secretary of State's Office to notify registrars to begin issuing Voter ID cards immediately. (*Id.*) On that same day, the Elections Division notified the registrars, and the registrars began issuing Voter ID cards on June 30, 2006. (*Id.*)

During the June 29, 2006, meeting, the State Election Board approved a voter education piece listing the acceptable forms of identification, explaining where and how to obtain a Voter ID card or a State ID card, and stating that voters may vote an absentee ballot without providing Photo ID. (C. McIver Decl. ¶ 11 & Ex. 2.) The piece will be handed out during the absentee voting period beginning on July 10, 2006, as well as at the polls on July 18, 2006. (*Id.*) For larger counties, the State Election Board printed and distributed the education piece, and directed the counties to distribute the piece during advance voting and at the polls on July 18, 2006. (*Id.* ¶ 12.) For smaller counties, the State Election Board provided the template for the piece, supplied paper, and instructed the counties to print the piece for distribution during early voting and on primary election day. (*Id.*) According to Mr. McIver, the piece is designed for the voters whom Plaintiffs allege will appear at the polls in large numbers without a Photo ID.

(*Id.* ¶ 13.) Mr. McIver points out that voters who lack a Photo ID may vote in-person using a provisional ballot, and that those voters may have their votes counted if they can provide necessary documentation within forty-eight hours. (*Id.*) The State Election Board also plans to mail the piece to organizations such as the AARP, the NAACP, and the League of Women Voters, to allow those organizations to distribute the letter to the public. (*Id.* ¶ 14.)

Mr. McIver notes that the list prepared by the Secretary of State's Office concerning the number of registered voters who lack driver's licenses or State ID cards issued by the DDS is flawed and unreliable. (C. McIver Decl. ¶ 15 & n.1.) The State Election Board, however, will make the list of names and addresses available, without an Open Records Act request and without charge, to any person making a request for the list. (*Id.*) Groups interested in voter education efforts can obtain the list and the education piece to educate the voters. (*Id.*)

According to Mr. McIver, even if a voter needs to obtain a Voter ID card, there is no support for a theory that registrars will be too busy with no-excuse absentee voting to issue Voter ID cards. (C. McIver Decl. ¶ 16.) Even though Plaintiffs and other voter rights groups complain about the State Election Board's education efforts, to Mr. McIver's knowledge, none of the organizations that are Plaintiffs in this litigation have engaged in voter education efforts concerning the Photo ID requirement. (*Id.* ¶ 17.)

Mr. McIver states that the State Election Board has engaged in other voter education efforts, including television and radio public service announcements that either are airing currently or that will air this week. (C. McIver Decl. ¶ 18.) According to Mr. McIver, those announcements provide information about the need

to bring Photo ID to the polls, the types of acceptable Photo ID, the process for obtaining a Voter ID card, and the availability of no-excuse absentee voting without a Photo ID card. (*Id.*) The radio ads began airing on Friday, July 7, 2006, on over 100 stations, airing three times a day. (*Id.* ¶ 19 & Ex. 3.) The ads are scheduled to run three times a day. (*Id.*) The television ads began airing on Wednesday, July 5, 2006, on the 150 Georgia affiliates of Northland Cable. (*Id.* ¶ 20.) The Georgia Association of Broadcasters also distributed the television ads to all of its affiliates, which include all Georgia television stations. (*Id.* ¶ 21.) Those ads began to run on or before July 7, 2006. (*Id.*)

Mr. McIver has appeared for interviews concerning voter education that aired on several television and radio stations during prime time. (C. McIver Decl. ¶ 22.) On Tuesday, July 11, 2006, Mr. McIver will appear on a thirty-minute radio show titled "Georgia Focus," and the show will air on fifty-eight radio stations listed on Exhibit 4 to Mr. McIver's affidavit. (*Id.*)

The State Election Board also has begun work on a brochure to send to voters, with a target distribution date of September 1, 2006. (C. McIver Decl. ¶ 23.) The brochure will tell voters about the need to bring Photo ID to the polls, the types of acceptable Photo ID, the process for obtaining a free Voter ID card, and the availability of no-excuse absentee ballots without a Photo ID. (*Id.*)

Mr. McIver notes that the State has an unlimited supply of temporary Voter ID cards, which the registrars will issue to voters "on the spot." (C. McIver Decl. ¶ 24.) Those temporary cards are good for forty-five days, allowing time for voters to vote in elections while waiting to receive the permanent Voter ID card. (*Id.*) The demand for the cards has been extremely low. (*Id.*) Further, the State Election

Board can obtain funding to purchase more than 10,000 Voter ID cards if necessary. (*Id.*)

**17. Second Declaration of Cathy Cox**

In her position as Secretary of State, Cathy Cox serves as the Chair of the State Election Board. (Second Decl. of Cathy Cox ¶ 2.) Secretary of State Cox does not know how many registered voters in Georgia lack an acceptable Photo ID. (*Id.* ¶ 3.) Although Secretary of State Cox used information from the AARP and the League of Women Voters estimating the number of such voters, Secretary of State Cox did not personally verify that 152,000 registered voters in Georgia lacked a Photo ID necessary for in-person voting. (*Id.*)

Secretary of State Cox's office requested that the DDS conduct a database comparison between their database of individuals with driver's licenses or DDS-issued Photo ID cards and a database of registered voters that the Secretary of State's Office supplied to DDS. (C. Cox Second Decl. ¶ 4.) The database of registered voters that the Secretary of State's Office supplied to DDS was a compilation of the voter rolls that the Secretary of State's Office had on file for Georgia's 159 counties. (*Id.*) The individual rolls are, in large part, maintained by each individual county, even though the Secretary of State's Office has concurrent power to remove deceased voters from the registration lists. (*Id.*) Some counties do a very good job of keeping their lists current, while others do not. (*Id.*)

Secretary of State Cox has no personal knowledge concerning the performance of the database comparison, did not participate in making the arrangements for the comparison, and was not involved in the communications between her office and DDS concerning the comparison. (C. Cox Second Decl. ¶ 5.) Although DDS sent

"matched files" to the Secretary of State's Office, and the Secretary of State's Office used those files to create a list of individuals who apparently were not matches in the comparison, Secretary of State Cox does not know what constituted a "match" or what constituted a "no match." (*Id.* ¶ 6.)

After the Secretary of State's Office received the information and created its "no match" list, it broke that list down by county of residence and by race and sex, if available. (C. Cox Second Decl. ¶ 7.) The Secretary of State's Office and the DDS did not do an analysis or breakdown of economic status. (*Id.*)

Other than the database comparison with DDS, the Secretary of State's Office did not request another database comparison to determine whether people on the list of registered voters might have another acceptable form of Photo ID for voting. (C. Cox Second Decl. ¶ 8.)

Secretary of State Cox's idea of the scenario for in-person voter fraud is as follows: "A voter appears at the polls and votes as 'John Smith.' Subsequently, the actual John Smith appears, attempts to vote as himself and cannot." (C. Cox Second Decl. ¶ 9.) The Secretary of State's Office has not had a report of an attempt of that type of fraud in the past nine years; however, Secretary of State Cox does not dispute that under the previous law, it was possible for either that scenario or other forms of in-person voter fraud to occur. (*Id.*) Additionally, other issues related to in-person voter fraud may arise of which Secretary of State Cox and her staff are not made aware. (*Id.* ¶ 10.) Local election officials are in the best position to know of such issues. (*Id.*)

According to Secretary of State Cox, it currently is not possible to identify voters using a signature comparison at the polls. (C. Cox Second Decl. ¶ 11.) Although the State uses that procedure for mail-in absentee ballots, the procedure is not feasible for in-person voting because the mail-in absentee ballots involve far fewer voters and because the documentation needed to make the comparison is in the registrar's offices, not at the polls. (*Id.*) To conduct signature verifications at the polls, the State would need to scan in all of the signatures on file and provide each polling place with the hardware and software necessary to make the comparison. (*Id.*) This process would be expensive, and the State lacks the capability and funding for such a process at this time. (*Id.*)

Secretary of State Cox is personally opposed to the Photo ID requirements of the 2005 Photo ID Act and the 2006 Photo ID Act. (C. Cox Second Decl. ¶ 12.) Secretary of State Cox understood that when the 2006 Photo ID Act passed the General Assembly and was precleared by the DOJ, it was her duty and oath to uphold it. (*Id.*)

After the 2006 Photo ID Act was passed and precleared by the DOJ, the State Election Board took action to implement it, including making arrangements to obtain the machinery, supplies, and training to produce the Voter ID cards and passing rules to provide direction to voters and local election officials concerning the issuance of the cards. (C. Cox Second Decl. ¶ 13.) After the DOJ precleared the rules, the State Election Board directed local election officials to begin issuing the Voter ID cards. (*Id.*) Local election officials have begun issuing the Voter ID cards. (*Id.*)

The Elections Division also has conducted training and distributed the necessary supplies to carry out the 2006 Photo ID Act's provision in the July 18, 2006, primary election and later elections. (C. Cox Second Decl. ¶ 14.) The State Election

Board also provided public information concerning the 2006 Photo ID Act's requirements on the Secretary of State's website and through other public information efforts. (*Id.*) The State Election Board also has approved written education material for distribution to voters, and has begun a series of radio public service announcements. (*Id.*)

### 18. Declarations of Voters Listed on the Data Match List

Defendants presented a number of declarations from Georgia voters whose names and addresses appear on the data match list, although the voters possess driver's licenses issued by DDS. (Decl. of Jeff E. Mullis ¶¶ 2–5; Decl. of Alisa Heiman Aczel ¶¶ 2–5; Decl. of Virginia Balfour ¶¶ 2–5; Decl. of Meredith Lynn Blackburn ¶¶ 2–5; Decl. of Shiriki Lean Cavitt ¶¶ 2–5; Decl. of Cynthia Hinrichs Clanton ¶¶ 2–5; Decl. of Ruby J. Kajumba ¶¶ 2–5; Decl. of Jeff E. Mullis ¶¶ 2–5; Decl. of Mary J. McCauley ¶¶ 2–5; Decl. of Jeffrey W. Mueller ¶¶ 2–5; Decl. of Shereen M. Walls ¶¶ 2–5; Decl. of Stefan Passantino ¶¶ 2–5; Decl. of Oscar N. Persons ¶¶ 2–5; Decl. of Joel M. Rainer ¶¶ 2–5; Decl. of Joan M. Ransom ¶¶ 2–5; Decl. of Hank Richardson ¶¶ 2–5; Decl. of Dewitt R. Rogers ¶¶ 2–5.)

### 19. The July 12, 2006, Hearing

On July 12, 2006, the Court held a hearing to address Plaintiffs' Second Motion for Preliminary Injunction. During that hearing, the Court heard testimony from witnesses, as well as arguments from the parties. Secretary of State Cox and Mr. McIver gave testimony during the July 12, 2006, hearing.

### a. Testimony of Cathy Cox

Secretary of State Cox testified at the Court's October 12, 2005, hearing concerning the 2005 Photo ID Act. Since her October 12, 2005, testimony, Secretary of State Cox's office and the State Election Board have received no formal or informal complaints of in-person voter fraud. (July 12, 2006, Hr'g Tr.) Because Secretary of State Cox and her staff are not physically present at every precinct in Georgia for election days, Secretary of State Cox and her office may not know of all instances of in-person voter fraud that may have occurred. (*Id.*)

Secretary of State Cox's office and the State Election Board, however, have received complaints of fraud in absentee voting. (July 12, 2006, Hr'g Tr.) A number of those complaints have involved irregularities in collecting and returning absentee ballots, in which someone who was not authorized to collect or mail the absentee ballots did so for another voter. (*Id.*)

The Georgia legislature has not proposed legislation to modify the requirements for registering to vote in Georgia. (July 12, 2006, Hr'g Tr.) The Federal Help America Vote Act ("HAVA") requests that individuals provide certain types of identification when registering to vote; however, HAVA does not require that the individuals present such identification. (*Id.*)

On June 19, 2006, Secretary of State Cox's office issued a press release indicating that over 600,000 voters lack a valid Georgia driver's license or a Photo ID card issued by DDS. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 5.) Secretary of State Cox's office obtained that information from a data match that Secretary of State Cox authorized. (July 12, 2006, Hr'g Tr.) To conduct the data match, Secretary of State Cox's office provided DDS with a list of registered voters that Secretary of State Cox's office maintained. (*Id.*) DDS then compared the list of registered voters to its database of individuals who had valid Georgia driver's licenses and Photo ID

cards issued by DDS. (*Id.*) DDS returned a list of over 600,000 individuals who appeared on the voter registration list and who lacked valid Georgia driver's licenses or DDS-issued Photo ID cards. (*Id.*) The list intended to match individuals by last name, date of birth, and social security number. (*Id.*) Individuals whose social security numbers were not in the database appeared on the list as not having a valid Georgia driver's license or DDS-issued Photo ID card. (*Id.*)

According to Secretary of State Cox, in ordering the data match, her office was not intending to inflate the numbers of voters who purportedly lacked a Georgia driver's license or Photo ID card. (July 12, 2006, Hr'g Tr.) Rather, her office was attempting to identify the smallest number of voters possible who lacked a Photo ID so that her office could do a direct mailing to advise those voters of the 2006 Photo ID Act's requirements. (*Id.*)

On June 23, 2006, Secretary of State Cox's office issued another press release stating that the voters who purportedly lacked a Photo ID were disproportionately elderly or minority voters. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 6.) The numbers used for that press release came from the data match that Secretary of State Cox's office ordered. (July 12, 2006, Hr'g Tr.)

Secretary of State Cox testified that she was not aware of other data available to her office or to the State that would provide more accurate information concerning the number of voters who lacked a Photo ID. (July 12, 2006, Hr'g Tr.) Secretary of State Cox's office and the local registrars attempt to update the voter registration list to keep the list free of improper registration. (*Id.*) To Secretary of State Cox's best knowledge, those procedures are consistently followed; however, Secretary of State Cox cannot vouch for what every individual county does. (*Id.*) Secretary of

State Cox's office is authorized to remove only deceased voters from the voter registration list, and cannot remove voters who are otherwise ineligible to vote. (*Id.*) Secretary of State Cox's office also relies on the counties to add voters who have newly registered to vote, and has no authority to add newly registered voters. (*Id.*)

Secretary of State Cox testified that she has learned of a "few dozen" inaccuracies in the data match list of voters. (July 12, 2006, Hr'g Tr.) According to Secretary of State Cox, those inaccuracies do not have a material effect on the accuracy of the data match list. (*Id.*) Secretary of State Cox, however, has no personal knowledge of the data match list's accuracy. (*Id.*)

Secretary of State Cox does not know how many Georgia voters lack any acceptable form of Photo ID under the 2006 Photo ID Act. (July 12, 2006, Hr'g Tr.) Her office did not match its list of registered voters to federal government databases, to databases of other state government agencies that issue identification cards, or to tribal identification lists. (*Id.*)

The State Election Board has promulgated rules and regulations to enforce the 2006 Photo ID Act. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 7.) To Secretary of State Cox's knowledge, no copies of those rules and regulations have been mailed to any registered voters. (July 12, 2006, Hr'g Tr.) Secretary of State Cox testified that her office would mail copies of the rules and regulations to voters who requested copies. (*Id.*) Secretary of State Cox's office has shared the rules and regulations with the county registrars. (*Id.*) Secretary of State Cox's office also has posted the rules and regulation on its website. (*Id.*)

Before the State Election Board adopted the rules and regulations, it posted those rules and regulations for comment. (July 12, 2006, Hr'g Tr.) Secretary of State Cox

testified that the State Election Board posted the proposed rules and regulations on its website and on the doors of the State election office in Atlanta, Georgia. (*Id.*)

The State Election Board drafted a letter to give to voters during the July 18, 2006, primary election that describes the requirements of the 2006 Photo ID Act and explains where to obtain a Voter ID card. (July 12, 2006, Hr'g Tr.) Absent an injunction against the 2006 Photo ID Act, if a voter appears at the polls and does not have an acceptable Photo ID, the voter will be informed that he or she can vote a provisional ballot and return within forty-eight hours with a proper Photo ID. (*Id.*) If the voter does not return with a proper Photo ID within forty-eight hours, his or her vote will not be counted. (*Id.*)

Under the State Election Board's rules and regulations, a voter may present his or her voter registration application as a form of identification in order to obtain a Voter ID card. (July 12, 2006, Hr'g Tr.) To register to vote, an individual need not provide a social security number, and is not required to provide any other identifying documentation, including a Photo ID. (*Id.*) A voter thus could register to vote, provide his or her voter registration application to the registrar, and, once his or her voter registration application is accepted, obtain a Voter ID card, all without showing any other form of identifying information. (*Id.*) In theory, a voter who registered fraudulently several years ago now may use his or her fraudulent voter registration application to obtain a Voter ID card, which he or she may use to vote in person. (*Id.*)

Secretary of State Cox testified that the process of obtaining a Voter ID card is an additional step that an individual must go through to vote in person. (July 12, 2006, Hr'g Tr.) To that extent, the Voter ID card process could serve as a deterrent to fraud. (*Id.*)

Voters who vote in-person are required to sign a voter certificate certifying that the information provided on the certificate is true. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 9.) Making a false statement on the certificate is a felony. (July 12, 2006, Hr'g Tr.)

Voters who wish to apply for an absentee ballot need not complete a particular form. (July 12, 2006, Hr'g Tr.) A voter who desires an absentee ballot need only send a letter to his or her county registrar stating that the voter wants an absentee ballot and providing the voter's name and address. (*Id.*) If the voter cannot complete such a letter himself, he may get assistance from someone else. (*Id.*) Similarly, a voter may get assistance from someone else when completing an absentee ballot and placing it in the required inner and outer envelopes. (*Id.*)

Voting absentee by mail is an easier process under the current law. (July 12, 2006, Hr'g Tr.) Some campaign organizations, including Secretary of State Cox's own campaign organization, have mailed absentee ballot applications to voters, stating that the absentee voting by mail process is easy. (*Id.*; Defs.' Ex. 1.)

According to Secretary of State Cox, if fifty percent of the voters in a Georgia election voted by absentee ballot, registrars would be required to spend a significant amount of time comparing the signatures on the ballots to the signatures on the voters' voter registration cards. (July 12, 2006, Hr'g Tr.) Secretary of State Cox, however, could not testify as to how much time would be required to complete that process. (*Id.*)

Georgia has continued to attempt to update its in-person voting process by moving to touch-screen voting machines and by purchasing new equipment. (July 12,

2006, Hr'g Tr.) Although Secretary of State Cox's office has discussed digitizing the signatures on voter education cards, that process is not part of the current effort to update the in-person voting process. (*Id.*)

### b. Testimony of Claud L. ("Tex") McIver, III

Claud L. ("Tex") McIver, III, is an attorney who serves as vice-chair of the State Election Board. (July 12, 2006, Hr'g Tr.) Mr. McIver has served in that position since July 2005, and has taken an active role in advocating for the passage of the 2006 Photo ID Act. (*Id.*) According to Mr. McIver, he has worked to draft a statute that responded to the concerns expressed by the Court in its October 12, 2005, Order preliminarily enjoining the 2005 Photo ID Act. (*Id.*) His objectives were to focus on the cost of Photo ID cards and ease of access to obtain those cards. (*Id.*)

In his position as vice-chair of the State Election Board, Mr. McIver worked to implement the 2006 Photo ID Act. (July 12, 2006, Hr'g Tr.) His responsibilities included ensuring that the State purchased equipment to create Voter ID cards and to evaluate the operation of that equipment, as well as overseeing the installation of the equipment and related training. (*Id.*) The State has selected a vendor for the equipment, and the equipment has been installed in all of Georgia's 159 counties. (*Id.*)

Registrars received training concerning the Voter ID card equipment during the Georgia Registrars Convention held in May 2006. (July 12, 2006, Hr'g Tr.) Twenty to thirty counties also requested, and received, individual training from the vendor of the equipment. (*Id.*)

Counties have begun issuing Voter ID cards. (July 12, 2006, Hr'g Tr.) As of July 12, 2006, Georgia counties had issued a total of 420 Voter ID cards. (*Id.*) Ten Atlanta metropolitan area counties issued 109 of the cards, while counties outside the Atlanta metropolitan area issued the remaining cards. (*Id.*)

Counties issue a temporary Voter ID card to voters on the day that the voters appear to request the Voter ID card. (July 12, 2006, Hr'g Tr.) The temporary Voter ID cards are valid for forty-five days. (*Id.*) The vendor is responsible for mailing permanent Voter ID cards to the voters, and usually does so within three days after the voters request the cards. (*Id.*) The counties may issue an unlimited number of temporary Voter ID cards, and the counties have supplies of applications for the Voter ID cards. (*Id.*)

The State contracted with the vendor of the Voter ID card equipment for the vendor to provide 10,000 Voter ID cards. (July 12, 2006, Hr'g Tr.) The State's contract with the vendor, however, provides that the State may purchase additional Voter ID cards if necessary. (*Id.*)

The State Election Board published rules and regulations for issuing and obtaining Voter ID cards. (July 12, 2006, Hr'g Tr.) Those rules and regulations were subject to the usual rule-making process, including a public comment period. (*Id.*) The State Election Board published the rules and regulations more than thirty days prior to the meeting at which it adopted the rules and regulations. (*Id.*) According to Mr. McIver, the list of documentation that is acceptable for obtaining a Voter ID card was intended to be as inclusive as possible, so as not to restrict voters who wished to obtain Voter ID cards. (*Id.*)

The State Election Board's rules and regulations specify the hours that registrars' offices must remain open. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 7.) The rules and regulations specifically require that the

registrars' offices remain open from eight a.m. to five p.m. on the Monday through Friday during the week prior to an election. (July 12, 2006, Hr'g Tr.; Pls.' Ex. 7.) In some counties, the registrar's office is not open except as mandated by the State Election Board. (July 12, 2006, Hr'g Tr.) The State Election Board's rules and regulations do not require that the registrars' offices remain open during the forty-eight hours after an election. (*Id.*) Mr. McIver, however, believes that registrars' offices must remain open each business day during regular business hours. (*Id.*)

The State Election Board has made information concerning the process and requirements for obtaining Voter ID cards available to local registrars, and has placed that information on its website. (July 12, 2006, Hr'g Tr.) The State Election Board also has used television and radio paid public service announcements ("PPSAs") to inform voters of the Photo ID requirement and the process and locations for obtaining Voter ID cards. (*Id.*) The State Election Board also prepared a voter education letter to be distributed to voters during the July 18, 2006, primary. (*Id.*)

According to Mr. McIver, the State Election Board felt that giving a letter to voters on the day of the primary election would be effective in educating the voters. (July 12, 2006, Hr'g Tr.) The State Election Board has made that letter available to any organization that wishes to distribute the letter; however, Mr. McIver is not aware of any organization that has distributed the letter. (*Id.*)

The State Election Board received some comments concerning the content of the letter and its readability during the hearing in which the State Election Board approved the letter. (July 12, 2006, Hr'g Tr.) The State Election Board has not asked a literacy expert to review the letter to determine whether the average Georgia voter can read and understand the letter. (*Id.*)

The letter to be provided to voters at the polls does not contain a statement informing voters who vote provisional ballots that they must return with Photo ID within forty-eight hours to have their provisional ballots counted. (July 12, 2006, Hr'g Tr.) According to Mr. McIver, poll workers will give verbal instructions concerning the forty-eight hour requirement to voters who receive provisional ballots. (*Id.*)

The television PPSAs are thirty-second advertisements that have run on channels that are members of the Georgia Association of Broadcasters. (July 12, 2006, Hr'g Tr.) Since the State Election Board began running its PPSAs, the total number of Voter ID cards issued has increased with each day. (*Id.*)

The radio PPSAs have run on the Clear Channel network, which consists of 115 radio stations in Georgia. (July 12, 2006, Hr'g Tr.) The network has a total estimated listening population of 900,000, including individuals who reside in neighboring states. (*Id.*) Some of the radio PPSAs air very early on Saturday and Sunday mornings. (*Id.*) According to Mr. McIver, the State Election Board selected the best option that it had, other than buying very expensive spots. (*Id.*)

Mr. McIver is concerned that the data match list obtained by the Secretary of State is inaccurate. (July 12, 2006, Hr'g Tr.) In particular, Mr. McIver is concerned because the data match used only the DDS database, even though other databases were readily available. (*Id.*) According to Mr. McIver, the list is replete with errors, and lists many individuals who actually possess a Georgia driver's license. (*Id.*) Mr. McIver is especially concerned that the Secretary of State's Office may not

have made a recent effort to purge the voter registration list of dead voters, although he has not conducted a statistical analysis to determine how many dead voters remain on the list. (*Id.*) The State Election Board and the legislature, however, made no other attempt to obtain a list of voters who lack an acceptable form of Photo ID. (*Id.*) After the Secretary of State's office obtained the data match list, the State did not have sufficient time to obtain another list prior to the primary elections. (*Id.*)

Mr. McIver believes that less than three thousand registered voters lack any acceptable form of Photo ID. (July 12, 2006, Hr'g Tr.) This opinion is Mr. McIver's personal opinion, based on the number of Photo IDs issued and the low number of Voter ID cards issued. (*Id.*) Mr. McIver is not an expert in the field of statistical analysis. (*Id.*)

Mr. McIver has not received reports that local elections officials are overwhelmed with voting duties and lack time to issue Voter ID cards. (July 12, 2006, Hr'g Tr.) Indeed, Mr. McIver testified that it takes less than one minute to input a Voter ID card application and to take the applicant's photograph. (*Id.*)

Voters who appear at the polls to vote in person and who lack an acceptable form of Photo ID may vote a provisional ballot. (July 12, 2006, Hr'g Tr.) The voters then will have forty-eight hours to return with an acceptable Photo ID to have their votes counted. (*Id.*)

According to Mr. McIver, the State Election Board has not received complaints of absentee voter fraud involving a voter casting an imposter absentee ballot during Mr. McIver's tenure on the Board. (July 12, 2006, Hr'g Tr.) Instead, the majority of the complaints received by the State Election Board have involved improperly soliciting potential voters and im-

properly returning absentee ballots to registrars offices. (*Id.*)

The State Election Board has not received complaints indicating that the absentee ballot application is too difficult to understand. (July 12, 2006, Hr'g Tr.) Many candidates for office regularly send out absentee ballot applications. (*Id.*)

## III. Discussion

### A. Standard for Obtaining a Preliminary Injunction

To obtain a preliminary injunction, a movant must show: (1) a substantial likelihood of ultimate success on the merits; (2) the preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would inflict on the non-movant; and (4) the preliminary injunction would serve the public interest. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998). In the Eleventh Circuit, " '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to the four requisites." *Id.* (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir. 1989)) (internal quotation marks omitted) (alterations in original).

A plaintiff seeking to enjoin enforcement of a state statute bears a particularly heavy burden. " '[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.' " *Bankwest, Inc. v. Baker,* 324 F.Supp.2d

1333, 1343 (N.D.Ga.2004) (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990)).

## B. Substantial Likelihood of Success on the Merits

### 1. Equal Protection Claim: Undue Burden

■ The Supreme Court has made it clear that voting is a fundamental right, *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), under the Fourteenth Amendment in the context of equal protection, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 629, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Indeed, in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court observed:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

376 U.S. at 17–18, 84 S.Ct. 526. Similarly, in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court stated:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

377 U.S. at 561–62, 84 S.Ct. 1362.

■ "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The equal right to vote, however, is not absolute. *Id.* Instead, states can impose voter qualifications and can regulate access to voting in other ways. *Id.* Under the United States Constitution, states may establish the time, place, and manner of holding elections for Senators and Representatives. U.S. Const. art. I, § 4, cl. 1. Those qualifications and access regulations, however, cannot unduly burden or abridge the right to vote. *Tashjian v. Republican Party*, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) ("[T]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote.") (citing *Wesberry*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481); *see also Dunn*, 405 U.S. at 359–60, 92 S.Ct. 995 (striking down Tennessee's durational residency voting requirement of one year in state and three months in county); *Beare v. Briscoe*, 498 F.2d 244, 247–48 (5th Cir.1974) (invalidating provisions of Texas Constitution and implementing statute requiring persons who wished to vote in any given year to register each year during registration period beginning on October 1 and ending on January 31 of following year) (per curiam). In particular, the Supreme Court has observed that wealth or the ability to pay a fee is not a valid qualification for voting. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666–68, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (citations omitted; footnote omitted).

A number of Supreme Court cases have set forth standards for determining whether a state statute or regulation concerning voting violates the Equal Protection clause. In *Dunn*, the Supreme Court stated that a court must examine: "the char-

acter of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn,* 405 U.S. at 335, 92 S.Ct. 995. Another Supreme Court case indicates that the Court should " 'consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " *Kramer,* 395 U.S. at 626, 89 S.Ct. 1886. Those cases apply strict scrutiny when examining state statutes or regulations that limit the right to vote. *Id.* at 627, 89 S.Ct. 1886 ("[I]f a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."); *see also Hill v. Stone,* 421 U.S. 289, 298, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) ("in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification").

In a more recent line of cases, the Supreme Court has not necessarily applied the strict scrutiny test automatically to regulations that relate to voting. *Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059; *Tashjian,* 479 U.S. at 213, 107 S.Ct. 544 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). Indeed, the Supreme Court observed in *Burdick:*

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends". Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently. Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny."
>
> Instead, ... a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."
>
> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's most important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059 (citations omitted).

Defendants argue that the Photo ID requirement simply regulates the manner of voting, and that requiring a Photo ID for in-person voting is a reasonable means of achieving the legitimate state interest of regulating voting and preventing in-person voter fraud. Defendants also contend again that the Photo ID requirement is not a severe restriction on voting because, in reality, it prevents no one from voting. Instead, according to Defendants, anyone may vote by absentee ballot under the new, more relaxed, absentee voting requirements. Defendants previously have argued that even voters who register by mail may vote for the first time via absentee ballot without showing a Photo ID, and that such voters simply must include a utility bill, a bank statement, or other form of identification permitted by HAVA with their absentee ballots as a means of voter identification. (Oct. 12, 2005, Hr'g Tr.)

Defendants observe that, at most, the Photo ID requirement prevents some individuals who wish to vote in person from doing so until they obtain proper identification. Defendants also point out that those individuals who lack a Photo ID may obtain one free of charge from a State DDS Office, the State's GLOW Bus, or from their county's registrar simply by appearing at those locations providing limited information.

Defendants also observe that although opportunities for voter fraud via absentee ballot or fraudulent voter registrations may exist, the legislature may address one method of voting at a time. In this case, the legislature has chosen to address voter fraud via in-person voting first.

■ The Court finds that the appropriate standard of review for evaluating the 2006 Photo ID Act is the *Burdick* sliding scale standard. Under that standard, the Court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights," *Burdick*, 504 U.S. at 433–34, 112 S.Ct. 2059.

### a. The Asserted Injury

■ For the reasons discussed below, the character and magnitude of the asserted injury to the right to vote is significant. Many voters who do not have driver's licenses, passports, or other forms of photographic identification have no transportation to a voter registrar's office or DDS service center, have impairments that preclude them from waiting in often-lengthy lines to obtain Voter ID cards or Photo ID cards, or cannot travel to a registrar's office or a DDS service center during those locations' usual hours of operation because the voters do not have transportation available. The evidence in the record demonstrates that many voters who lack an acceptable Photo ID for in-person voting are elderly, infirm, or poor, and lack reliable transportation to a county registrar's office. For those voters, requiring them to obtain a Voter ID card in the short period of time before the July 18, 2006, primary elections and the corresponding primary run-off elections is unduly burdensome. Indeed, those voters likely cannot obtain a Photo ID or Voter ID card before the July 18, 2006, primary elections and the corresponding run-off elections, resulting in their inability to vote in those elections.

In any event, even if registrars' offices or DDS service centers have extended hours, those extended hours will be of little help to voters who must obtain a Photo ID before the July 18, 2006, primary elections

and the corresponding primary run-off elections. The rules and regulations accompanying the 2006 Photo ID Act went into effect less than three weeks prior to the July 18, 2006, primary elections. Although the State has used PPSAs to notify or educate voters affected by the 2006 Photo ID Act about the availability of Voter ID cards at registrars' offices and the requirement to obtain a Photo ID prior to the July 18, 2006, primary elections, those PPSAs began running only two weeks before the July 18, 2006, primary elections. The radio PPSAs also run on a radio network with a relatively low total number of listeners, and many run at off-peak hours. It therefore is highly likely that a large number of Georgia voters who lack Photo IDs will not know of the 2006 Photo ID Act's requirements or the availability of a free Voter ID card until after the July 18, 2006, primary elections, and, perhaps, after the corresponding primary run-off elections.

Although the State Election Board has developed a letter for voters that explains the 2006 Photo ID Act and the availability of Voter ID cards, the State Election Board made no arrangements to distribute that letter to voters who lacked Photo ID prior to the July 18, 2006, primary elections. Instead, the State Election Board plans to distribute the letter *when the voters appear to vote in person* during the July 18, 2006, primary elections or during the related advance voting. That method, however, is not reasonably calculated to reach the voters who are most likely to lack a Photo ID, many of whom may not appear at the polls or the registrar's office during those times. Further, even those voters who lack a Photo ID and who appear to vote in-person may decline the option of voting a provisional ballot for the primary elections because they believe they cannot obtain a Photo ID and return with it within forty-eight hours.

Given that the State only recently began its education efforts concerning the 2006 Photo ID Act, and given the short period of time between the DOJ's preclearance of the State Election Board's rules and regulations and the July 18, 2006, primary elections and the corresponding primary run-off elections, the fact that relatively few Georgia voters have obtained Voter ID cards since the DOJ precleared the applicable rules and regulations certainly is not an indication that few Georgia voters lack Photo ID or that those Georgia voters who lack Photo ID are generally uninterested in voting in-person. Instead, those voters likely have not had sufficient time to become aware of the 2006 Photo ID Act's Photo ID requirements and to arrange to travel to a registrar's office and obtain a Voter ID card. As Mr. McIver testified at the July 12, 2006, hearing, the number of Voter ID cards issued increased daily after the State Election Board began airing its PPSAs. This testimony indicates that voters who lack Photo ID very well may avail themselves of the Voter ID card option once the State has had sufficient time to reach those voters and the voters have had sufficient time to make arrangements to travel to their respective registrars' offices and obtain the cards.

Even if the State had made the effort to educate voters about the Photo ID requirement and to publicize the availability of Voter ID cards, requiring voters to obtain a Photo ID within the short time period before the July 18, 2006, primary and the corresponding primary run-off elections still is unduly burdensome. The State has provided only one piece of equipment for issuing Voter ID cards to each county, regardless of population size. Voters would have less than three weeks prior to the July 18, 2006, primary election to obtain Voter ID cards, and only one, or, for counties that have purchased additional

equipment, perhaps two or three locations to obtain the cards. Many voters who are elderly, disabled, or have certain physical or mental problems simply cannot navigate that process or any long waits successfully.[1]

Further, some of the registrar's offices, particularly in large Georgia counties, may be a lengthy drive away from many of the citizens those registrar's offices service. Most of the registrar's offices are located in largely rural areas where mass transit likely is not available, and registered voters who have no driver's licenses or access to automobiles simply may not be able to obtain transportation to a registrar's office prior to the July 18, 2006, primary elections and the corresponding run-off elections.[2]

Defendants, once again, argue that the 2006 Photo ID Act does not deprive voters of the right to vote. Defendants observe that voters can vote via mail-in absentee ballot without producing any Photo ID at all in most instances. As previously noted with respect to the 2005 Photo ID law, most voters likely would be unaware that they could vote via mail-in absentee ballot without a Photo ID. Further, although the State Election Board has begun to run PPSAs that discuss the availability of mail-in absentee voting without a Photo ID, those ads began to run only shortly prior to the July 18, 2006, primary elections. Voters who wished to vote via mail-in absentee ballot for those elections most likely would not have had sufficient time to complete a request for an absentee ballot, mail the request to the registrar's office, receive an absentee ballot, vote the absentee ballot, and return the absentee ballot to the registrar's office by mail sufficiently early to ensure the ballot's receipt by July 18, 2006.[3]

Further, the 2005 Photo ID Act also changed the law governing absentee voting to eliminate the conditions previously required for obtaining an absentee ballot, which had been in effect for some time. In connection with the 2005 Photo ID Act, counsel for the State Defendants stated that the State had not publicized the new requirements for absentee voting any more or less than the State publicized any other change in election law. Secretary of State Cox testified at the previous hearing that the absentee voting rules in effect prior to the passage of the 2005 Photo ID Act required voters to aver that they met one of several specified requirements to obtain an absentee ballot. Absent more information indicating that the State has made a further effort to inform Georgia voters concerning the new, relaxed absentee voting procedures, many Georgia voters simply may be unaware that the rules have changed. Those voters therefore still may believe that they must satisfy one of the former requirements to obtain an absentee ballot. Voters who cannot satisfy the former requirements likely will not even attempt to obtain an absentee ballot. Further, as discussed in the preceding paragraph, the State did not begin its voter education efforts sufficiently in advance of the July 18, 2006, primary elections to

---

1. Going to a DDS service center to obtain a Photo ID card would also be burdensome for those voters. As the Court noted in its October 18, 2005, Order, many voters might have difficulty obtaining a Photo ID card from a DDS service center because Georgia has relatively few such centers, and the centers usually have lengthy lines.

2. The Court noted in its October 18, 2005, Order that many voters who resided in rural areas similarly would have severe difficulty in traveling to a DDS service center to obtain a Photo ID card.

3. The Court discusses the mail-in absentee voting process in more detail *infra*.

allow voters who learned of the availability of no-excuse mail-in absentee voting without a Photo ID to navigate that process successfully. Consequently, the Court simply cannot assume that Georgia voters who do not have a Photo ID could have made the arrangements necessary to vote via the mail-in absentee voting process for the July 18, 2006, primary elections and the corresponding primary run-off elections.

In any event, as Secretary of State Cox pointed out during the October 12, 2005, hearing, a mail-in absentee ballot is only counted if it is received by the registrar in the voter's jurisdiction by 7:00 p.m. on the day of the elections. Even absentee ballots postmarked by that date but delivered after 7:00 p.m. on election day are not counted. The only method voters have of ensuring that their votes are counted is to show up at their polling precinct on election day and vote in person or to hand-deliver their absentee ballots to the registrar in their jurisdiction before 7:00 p.m. on election day.[4]

As the Court previously noted, the absentee voting process also requires that voters plan sufficiently enough ahead to request an absentee ballot, to have the ballot delivered from the registrar's office via the United States Postal Service, to complete the ballot successfully, and to mail the absentee ballot to the registrar's office sufficiently early to allow the United States Postal Service to deliver the absentee ballot to the registrar by 7:00 p.m. on election day. The majority of voters— particularly those voters who lack Photo ID—would not plan sufficiently enough in advance of the July 18, 2006, primary elections to vote via mail-in absentee ballot successfully for those elections. In fact, most voters likely would not be giving serious consideration to the election or to the candidates until shortly before the election itself. Under those circumstances, and given the timing of the State's education efforts, it simply is unrealistic to expect that most of the voters who lack Photo IDs would take advantage of the opportunity to vote an absentee ballot by mail for the July 18, 2006, primary elections and the corresponding primary run-off elections.

Additionally, evidence submitted by Plaintiffs in connection with the 2006 Photo ID Act indicates that many Georgia voters have literacy skills that are below the level required to navigate the absentee voting process successfully without assistance. For those voters, absentee voting would not be an acceptable or reasonable alternative to in-person voting unless those voters could obtain help from someone else to negotiate the absentee voting process. It is unlikely that the voters would have sufficient time or resources to do so before the July 18, 2006, primary elections and the corresponding run-off elections.

For the reasons discussed above, with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections, absentee voting simply is not a realistic alternative to voting in person that is reasonably available for most voters who lack Photo ID. The fact that voters, in theory, may have the alternative of voting an absentee ballot without a Photo ID

---

**4.** The second method assumes voters know that they may hand-deliver absentee ballots and that voters know where to deliver those ballots. Many voters simply may believe that they can hand-deliver their absentee ballots to a polling place, which is not a viable alternative. Furthermore, many absentee voters do not drive or otherwise lack transportation. Although many organizations provide free transportation to the polls on election day, the availability of free transportation to the registrar's office to deliver an absentee ballot likely is limited or nonexistent.

during the July 18, 2006, primary elections and the corresponding primary run-off elections thus does not relieve the burden on the right to vote caused by the Photo ID requirement.[5]

Additionally, the State argues that voters who do not have Photo ID will not be "turned away" from the polls; rather, those voters may vote a provisional ballot and return within forty-eight hours with a Voter ID card. Given the difficulty of obtaining a Voter ID card and Photo ID card discussed above, it is highly unlikely that many of the voters who lack Photo ID and who would vote via provisional ballots could obtain a Voter ID card or a Photo ID card and return to the polls or the registrar's office within the forty-eight hour period. Indeed, although many organizations are more than happy to transport individuals to polling places on election day, it is unlikely that those organizations or any other organization or individual would be able or willing to provide transportation to registrar's offices or DDS service centers to allow voters of provisional ballots to obtain Voter ID cards or Photo ID cards. The ability to vote a provisional ballot for the July 18, 2006, primary elections and the corresponding primary run-off elections thus is an illusion.

Further, many voters may not even attempt to vote a provisional ballot in person because they do not have a Photo ID, and they believe that they cannot make the necessary arrangements to obtain a Photo ID within forty-eight hours after casting their votes. As discussed above, given the State's lack of effort to publicize the re-

quirements of the 2006 Photo ID Act and the availability of Voter ID cards to those voters who lack Photo ID, many of the voters who lack a Photo ID may not even know of the fact that a provisional ballot is available or where or how to obtain a Voter ID card. Additionally, the State Election Board's plan to advise affected voters of the 2006 Photo ID Act's Photo ID requirement by handing voters who appear at the polls on July 18, 2006, or for advance voting a letter explaining the 2006 Photo ID Act and describing how to obtain a Voter ID card, along with a provisional ballot, is too little, too late. As previously noted, given the characteristics of the Georgia voters who are most likely to need a Voter ID card, it is highly unreasonable to expect those voters to be able to go to their respective registrars' offices or DDS service centers and negotiate the process for obtaining a Voter ID card or Photo ID card within the forty-eight hour period required to have their provisional ballots counted. Faced with those circumstances, many of those voters likely will decide not to vote at all.

The right to vote is a delicate franchise. As the Court observed in its October 18, 2005, Order, a previous Plaintiff in the case, Plaintiff Tony Watkins, declined to pursue his claim concerning the 2005 Photo ID Act when he was informed that Defendants planned to depose him. Given the fragile nature of the right to vote, and the restrictions discussed above, the Court finds that the 2006 Photo ID Act imposes "severe" restrictions on the right to vote with respect to the July 18, 2006, primary elections and the corresponding primary

---

**5.** Defendants argue again that no constitutional right to vote in person exists, citing Oregon's policy of having elections conducted entirely by mail. Oregon's voting by mail structure differs significantly from Georgia's voting procedures. One major difference between Georgia's Photo ID requirement and Oregon's policy of conducting mail elections that is particularly noteworthy is that Oregon's policy places the same burden on every voter. Here, Georgia's Photo ID requirement places the burden of voting absentee on the very class of voters who will be least likely to navigate that method of voting successfully.

run-off elections. In particular, the 2006 Photo ID Act's Photo ID requirement makes the exercise of the fundamental right to vote extremely difficult for the July 18, 2006, primary elections and the corresponding primary run-off elections for voters currently without acceptable forms of Photo ID for whom obtaining a Photo ID or a Voter ID card would be a hardship. Unfortunately, the 2006 Photo ID Act's Photo ID requirement is most likely to prevent Georgia's elderly, poor, and African–American voters from voting in the July 18, 2006, primary elections and subsequent run-off elections. The Court again observes that for those citizens, the character and magnitude of their injury— the loss of their right to vote—is undeniably demoralizing and extreme, as those citizens are likely to have no other realistic or effective means of protecting their rights.

### b. State Interest

The State and the State Defendants assert that the 2006 Photo ID Act's Photo ID requirement is designed to curb voting fraud. Undoubtedly, this interest is an important one. Unfortunately, the fact that the interest asserted is important and is legitimate does not end the Court's inquiry.

### c. Extent to Which the State's Interest In Preventing Voter Fraud Makes It Necessary to Burden the Right to Vote

Finally, the Court must examine the extent to which the State's interest in preventing voter fraud makes it necessary to burden the right to vote. For the following reasons, the Court finds that the 2006 Photo ID Act's Photo ID requirement is not narrowly tailored to the State's proffered interest of preventing voter fraud. Secretary of State Cox testified at the previous hearing that her office has not received even one complaint of in-person voter fraud over the past nine years and that the possibility of someone voting under the name of a deceased person has been addressed by her Office's monthly removal of recently deceased persons from the voter roles. Additionally, although Defendants presented evidence from elections officials in connection with the 2005 Photo ID Act of fraud in the area of voting, all of that evidence addressed fraud in the area of voter registration and absentee voting, rather than in-person voting. The Photo ID requirement does not apply to voter registration, and any Georgia citizen of appropriate age may register to vote without showing a Photo ID. Indeed, individuals may register to vote by producing copies of bank statements or utility bills, or without even producing identification at all. The 2006 Photo ID statute, like its predecessor, thus does nothing to address the voter fraud issues that conceivably exist in Georgia.

Rather than drawing the 2006 Photo ID Act narrowly to attempt to prevent the most prevalent type of voter fraud, the State drafted its Photo ID requirement to apply only to in-person voters, and to apply only to absentee voters who had registered to vote by mail without providing identification and who were voting absentee for the first time. By doing so, the State, in theory, once again left the field wide open for voter fraud by absentee voting. Under those circumstances, the Photo ID requirement is not narrowly tailored to serve its stated purposes—preventing voter fraud. *See Dunn*, 405 U.S. at 343, 92 S.Ct. 995 ("Statutes affecting constitutional rights must be drawn with 'precision,' and must be 'tailored' to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may

not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'") (citations omitted). Further, the State has a number of significantly less burdensome alternatives available to prevent in-person voting fraud, such as the voter identification requirements it previously used and numerous criminal statutes penalizing voter fraud, to discourage voters from fraudulently casting ballots or impersonating other voters. Given those available alternatives, the Court finds that the State easily could have avoided placing a severe burden on voters—the burden of requiring the voters to obtain Photo IDs before the July 18, 2006, primary elections and corresponding primary run-off elections—while still accomplishing its goal of preventing or deterring fraud in voting.

### d. Summary

For the reasons discussed above, the Court finds that a number of significantly less burdensome alternatives exist to address the State's interest other than requiring voters to obtain Photo IDs prior to the July 18, 2006, primary elections and the corresponding primary run-off elections. As noted above, the burden on the affected voters to obtain a Photo ID in the short period prior to the July 18, 2006, primary elections and the corresponding run-off elections is severe. Under those circumstances, the State Defendants' proffered interest does not justify the severe burden that the 2006 Photo ID Act's Photo ID requirement places on the right to vote with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections. For those reasons, the Court concludes that the Photo ID requirement fails even the *Burdick* test with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections.

Certainly, the State's attempt to make obtaining a Photo ID easier by allowing voters to avoid the DDS service centers is admirable, as is the State's attempt to avoid imposing a poll tax by making Voter ID cards available to voters without a fee. Unfortunately, the State's attempt to educate voters did not began sufficiently early to relieve the undue burden that the 2006 Photo ID Act places on voters who lack Photo ID. Indeed, the State did not seriously begin to educate its voters concerning the requirements of the 2006 Photo ID Act and the availability of a free Voter ID card until approximately two weeks before the July 18, 2006, primary elections. Under those circumstances, the State has failed to allow sufficient time to educate its voters, and has not taken into consideration the hardships that requiring voters to obtain a Voter ID card or Photo ID card within such a short time frame will place on many of the voters affected by the 2006 Photo ID Act.

In issuing this Order, the Court does not intend to imply that all Photo ID requirements would be invalid or overly burdensome on voters. Certainly, the Court can conceive of ways that the State could impose and implement a Photo ID requirement without running afoul of the requirements of the Constitution. Indeed, if the State allows sufficient time for its education efforts with respect to the 2006 Photo ID Act and if the State undertakes sufficient steps to inform voters of the 2006 Photo ID Act's requirements before future elections, the statute might well survive a challenge for such future. The 2006 Photo ID Act, however, fails the constitutional test with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections. Accepting that preventing voter fraud is a legitimate and important State concern, a number of significantly less burdensome alternatives exist to address the State's

interest in preventing voter fraud for the July 18, 2006, primary elections and corresponding primary run-off elections. For those reasons, the Court finds that Plaintiffs have a substantial likelihood of succeeding on their claim that the 2006 Photo ID Act violates the Equal Protection Clause because it imposes an undue burden on the right to vote with respect to the July 18, 2006, primary elections and primary run-off elections.

**2. Poll Tax**

■ Alternatively, Plaintiffs argue that the 2006 Photo ID Act is a constructive poll tax. The State attempted to address the poll tax concerns by making Voter ID cards available without payment of a fee for the cards themselves. Plaintiffs, however, argue that voters who do not have an approved Photo ID must bear the costs of traveling to a registrar's office in order to a Voter ID card, as well as the costs for obtaining any documents necessary to obtain a Voter ID card.

The Twenty–Fourth Amendment to the United States Constitution provides: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. The Twenty–Fourth Amendment thus applies to elections for certain federal officials.

Plaintiffs contend that the Voter ID card requirement is a constructive poll tax because voters who do not have other acceptable forms of Photo ID must obtain the Voter ID card to cast their votes in person at the polls. Although Defendants point out that the Voter ID cards are free, Plaintiffs argue that the Voter ID card is one

more burden that voters who lack a Photo ID must bear, and that this burden is a constructive poll tax.

In *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), the Supreme Court struck down a Virginia requirement that a federal voter either pay the customary poll taxes as required for state elections or file a certificate of residence. The Supreme Court reasoned that the requirement to file a certificate of residence imposed a material requirement solely upon those who refused to surrender their right to vote in federal elections without paying the poll tax, and, consequently, the requirement violated the Twenty–Fourth Amendment. 380 U.S. at 541–42, 85 S.Ct. 1177. The Supreme Court stated:

It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. "Constitutional rights would be of little value if they could be ... indirectly denied," or "manipulated out of existence." Significantly, the Twenty-fourth Amendment does not merely insure that the franchise shall not be "denied" by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be "denied or abridged" for that reason. Thus, like the Fifteenth Amendment, the Twenty-fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. "It hits onerous procedural requirements which effectively handicap exercise of the franchise" by those claiming the constitutional immunity.

Thus, in order to demonstrate the invalidity of § 24–17.2 of the Virginia Code, it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections

without paying a poll tax. Section 24–17.2 unquestionably erects a real obstacle to voting in federal elections for those who assert their constitutional exemption from the poll tax. As previously indicated, the requirement for those who wish to participate in federal elections without paying the poll tax is that they file in each election year, within a stated interval ending six months before the election, a notarized or witnessed certificate attesting that they have been continuous residents of the State since the date of registration (which might have been many years before under Virginia's system of permanent registration) and that they do not presently intend to leave the city or county in which they reside prior to the forthcoming election. Unlike the poll tax bill which is sent to the voter's residence, it is not entirely clear how one obtains the necessary certificate.... This is plainly a cumbersome procedure. In effect, it amounts to annual re-registration which Virginia officials have sharply contrasted with the "simple" poll tax system. For many, it would probably seem far preferable to mail in the poll tax payment upon receipt of the bill. In addition, the certificate must be filed six months before the election, thus perpetuating one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate. We are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgement of his right to vote by reason of failure to pay the poll tax. The requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax. For federal elections, the poll tax is abolished absolutely as a pre-requisite to voting, and no equivalent or milder substitute may be imposed. Any material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban.

380 U.S. at 540–42, 85 S.Ct. 1177 (citations omitted; footnote omitted).

Similarly, in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Supreme Court struck down Virginia's poll tax requirement for state elections, finding that the poll tax violated the Equal Protection Clause. The Court stated:

We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate. Thus without questioning the power of a State to impose reasonable residence restrictions on the availability of the ballot, we held ... that a State may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services... Previously we had said that neither homesite nor occupation "affords a permissible basis for distinguishing between qualified voters within the State." We think the same must be true of requirements of wealth or affluence or payment of a fee.

383 U.S. at 666–67, 86 S.Ct. 1079 (citations omitted). The Court further observed:

[W]e must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race, are traditionally disfavored. To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant. In this context—that is, as a condition of obtaining a ballot—the requirement of fee paying causes an "invidious" discrimination that runs afoul of the Equal Protection Clause.

*Id.* at 668, 86 S.Ct. 1079.

After the enactment of the 2006 Photo ID Act's Photo ID requirement, voters who do not have other acceptable forms of Photo ID must obtain Voter ID cards to be able to vote in person at the polls. Voters who choose not to obtain Voter ID cards, or who are unable to obtain Voter ID cards for one reason or another, are free to vote via mail-in absentee ballot. As discussed *supra* Part III.A.1., however, mail-in absentee voting is unavailable for the July 18, 2006, primary elections and corresponding run-off elections to many voters who do not have forms of Photo ID—either because those voters are unaware of their eligibility to vote via mail-in absentee ballot or because the voters are unable to navigate the mail-in absentee voting process successfully. As a practical matter, therefore, many voters who do not have other acceptable forms of Photo ID must obtain a Voter ID card to cast their votes successfully and to ensure that their votes will be counted.

Because, as a practical matter, most voters who do not possess other forms of Photo ID must obtain a Voter ID card to exercise their right to vote, even though those voters have no other need for a Photo ID, requiring those voters to obtain a Voter ID card effectively places a burden on the right to vote. However, the Voter ID cards are available at no cost, and the State has eliminated the affidavit requirement for a fee waiver that the Court previously found objectionable with respect to the 2005 Photo ID Act. In support of their claim that the 2006 Photo ID Act still constitutes a poll tax, Plaintiffs argue that any material requirement imposed upon a voter solely because of the voter's refusal to pay a poll tax violates the Twenty-fourth Amendment. *Harman*, 380 U.S. at 542, 85 S.Ct. 1177. According to Plaintiffs, a voter who does not have another acceptable form of Photo ID and who wishes to vote must, as a practical matter, obtain a Voter ID card. To obtain a Voter ID card, the voter must arrange for transportation to a registrar's office, if that option is available, and must navigate the process successfully.

The Court agrees with the United States Court for the Southern District of Indiana's reasoning in rejecting a similar poll tax claim in a lawsuit concerning Indiana's Photo ID requirement for voting:

This argument represents a dramatic overstatement of what fairly constitutes a "poll tax." It is axiomatic that "(e)lection laws will invariably impose some burden upon individual voters," *Burdick v. Takuski* [sic], 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because those same "costs" also result from voter registration and inperson voting requirements, which one would not reasonably construe as a poll tax. Plaintiffs

provide no principled argument in support of this poll tax theory.

*Ind. Democratic Party v. Rokita,* No. 1:05–CV–0634–SEB–VSS, 2006 WL 1005037, at *38 (S.D.Ind. Apr.14, 2006). The Court therefore finds that Plaintiffs do not have a substantial likelihood of success on their poll tax claim.

Further, in this case, like *Rokita,* "[t]he only incidental cost which might plausibly approach being a poll tax is the fee assessed to obtain a birth certificate," which voters, in turn, may use to obtain a Voter ID card. *Rokita,* 2006 WL 1005037, at *38. Plaintiffs' contention that some voters might be required to pay a fee to obtain a birth certificate in order to obtain a Voter ID card, however, is wholly speculative. Plaintiffs have failed to show that any particular voter would actually be required to incur that cost in order to vote. Indeed, under the 2006 Photo ID Act and the accompanying rules and regulations adopted by the State Election Board, a birth certificate is only one of many documents that the registrar may accept to issue a Voter ID card. Consequently, Plaintiffs have failed to demonstrate that the cost of obtaining a birth certificate is sufficiently tied to the requirements of voting so as to constitute a poll tax. *Id.* For those reasons, the Court finds that Plaintiffs have no substantial likelihood of succeeding on their poll tax claim.

### 3. Civil Rights Act of 1964

■ Alternatively, Plaintiffs contend that the 2006 Photo ID Act's Photo ID requirement violates the Civil Rights Act of 1964, 42 U.S.C.A. § 1971, by applying different standards to absentee and in-person voters within the same county and by precluding voting due to an omission that is not material to the right to vote under Georgia law. Defendants argued with respect to the 2005 Photo ID Act that

both of Plaintiffs' claims under § 1971 failed as a matter of law because § 1971 does not furnish a private right of action. In the October 18, 2005, Order, the Court rejected that argument, concluding that the Eleventh Circuit had addressed the issue of whether § 1971 could be enforced by a private right of action in *Schwier v. Cox,* 340 F.3d 1284 (11th Cir.2003), and had concluded that such an action was available. 340 F.3d at 1297. The Court consequently found as a matter of law that Plaintiffs could assert a private right of action under § 1971 for the alleged voting rights violations at issue. The Court applies that ruling for purposes of Plaintiffs' Second Motion for Preliminary Injunction.

#### a. 42 U.S.C.A. § 1971(a)(2)(A)

First, Plaintiffs argue that the 2006 Photo ID Act's Photo ID requirement violates 42 U.S.C.A. § 1971(a)(2)(A) because the 2006 Photo ID Act applies different standards in determining whether individuals within the same county or other political subdivision are qualified to vote. 42 U.S.C.A. § 1971(a)(2)(A) provides that "[n]o person acting under color of state law shall," when

> determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

42 U.S.C.A. § 1971(a)(2)(A).

Specifically, Plaintiffs argue that the 2006 Photo ID Act's Photo ID requirement runs afoul of this subsection because the requirement applies different standards to voters who reside in the same city or county who vote absentee than it applies to people who vote in person. Plaintiffs note

that the 2006 Photo ID Act's Photo ID requirement applies only to voters who vote in person at the polls, while voters who vote absentee by mail do not have to comply with the Photo ID requirement unless they are registering to vote absentee, or are voting absentee for the first time. Additionally, voters who registered by mail and are voting by absentee ballot for the first time may include a utility bill or bank statement with their absentee ballot as a means of voter identification. (Oct. 12, 2005, Hr'g Tr.)

Plaintiffs point out that although the stated purpose of the 2006 Photo ID Act's Photo ID requirement is to prevent voter fraud, the requirement does nothing to address the largest sources of potential voter fraud—absentee voting and fraudulent voter registrations. In support of this argument, Plaintiffs cite to correspondence from Secretary of State Cox to Governor Perdue and the Georgia State Senate with respect to the 2005 Photo ID Act indicating that over her tenure, she and her staff could not recall a single case or complaint of voter impersonation at the polls. In contrast, her office received numerous complaints of fraudulent absentee voting during the same time period. The 2005 Photo ID Act, in Secretary of State Cox's opinion, expanded opportunities for absentee voting by mail by eliminating the previous restrictions on obtaining an absentee ballot. Further, evidence in the record indicates that no complaints of fraudulent in-person voting had been received since the Court's October 18, 2005, Order, even though the State Election Board had received complaints of fraudulent voter registrations and fraud in absentee voting. Consequently, Plaintiffs contend that the 2006 Photo ID Act's Photo ID requirement, by its plain language, clearly violates 42 U.S.C.A. § 1971(a)(2)(A) because it imposes standards on voters in the same county or city that differ for absentee voters versus in-person voters.

Defendants contend that the 2006 Photo ID Act does not apply different standards in determining whether any individual is qualified under State law to vote in person in any election. Defendants argue that individuals who choose to vote in person are all held to the same standard regardless of their race or color, and that individuals who choose to vote by absentee ballot are all held to the same standard regardless of their race or color.

The United States District Court for the Southern District of Indiana recently rejected a claim under § 1971(a)(2)(A) that Indiana's Photo ID Act applied different standards to voters by requiring in-person voters to present a Photo ID, while allowing absentee voters to cast their ballots without presenting a Photo ID. *Rokita*, 2006 WL 1005037, at *47. The court observed that even if § 1971 did apply to the plaintiffs' claims, it would not provide the plaintiffs with the relief they sought. *Id.* The court observed that:

> [A]bsentee voting is an *inherently* different procedure from voting in person, requiring a state which allows both in-person and absentee voting to apply different "standards, practices, or procedures" to these two groups of voters.... The only "difference" to which Plaintiffs seemingly object is the photo identification requirement, but in doing so they proceed without distinguishing this requirement from the plethora of other "standards, practices, and procedures" applicable to either absentee or in-person voters. Plaintiffs' proposed construction of § 1971(a)(2)(A) would compel the invalidation of vast portions of the Indiana Election Code. We will not bring about such a radical departure from settled law by our decisions here.

*Id.* (footnote omitted).

In Georgia, as in Indiana, absentee voting and in-person voting are inherently

different processes, and both processes use different standards, practices, and procedures. The Photo ID requirement established by the 2006 Photo ID Act for in-person voting is only one of those different standards, practices, and procedures. Adopting Plaintiffs' proposed interpretation of § 1971(a)(2)(A) thus would require the invalidation of vast portions of Georgia's election statutes—something that this Court is understandably reluctant to do, especially when those other statutes are not before the Court. Consequently, the Court finds that Plaintiffs do not have a substantial likelihood of success on their § 1971(a)(2)(A) claim.

### b. 42 U.S.C.A. § 1971(a)(2)(B)

■ Second, Plaintiffs contend that the 2006 Photo ID Act's Photo ID requirement violates 42 U.S.C.A. § 1971(a)(2)(B), which prohibits a person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C.A. § 1971(a)(2)(B).

Plaintiffs contend that to be qualified to vote in Georgia, a voter need only: (1) be a United States citizen; (2) be a legal resident of the county where he or she seeks to register; (3) be at least 18 years old; and (4) not be serving a sentence for a felony conviction involving moral turpitude or have been found mentally incompetent by a judge. Ga. Const. art. II, § 1. Plaintiffs observe that none of those requirements include presenting a Photo ID, and that a Photo ID therefore cannot be material to determining whether an individual is qualified under State law to vote. In any event, Plaintiffs argue that because

the 2006 Photo ID Act's Photo ID requirement does not apply to most absentee voters, the Photo ID requirement cannot be said to be "material" for purposes of 42 U.S.C.A. § 1971(a)(2)(B). Defendants argue that Plaintiffs' claim must fail because the 2006 Photo ID Act's Photo ID requirement does not add any condition on voter qualifications and because there is no error or omission on any record that is being used to disqualify any potential voter.

The United States District Court for the Southern District of Indiana recently rejected a similar claim under § 1971(a)(2)(B). *Rokita,* 2006 WL 1005037, at *48. That court reasoned:

> Plaintiffs' arguments regarding § 1971(a)(2)(B) similarly overstate the reach of that portion of the statute which prohibits the denial of the right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C. § 1971(a)(2)(B). Plaintiffs contend that SEA 483 violates this part of the statute because otherwise qualified, registered voters will be prevented from voting, or forced to use a provisional ballot, if they do not present a qualified photo identification. Defendants assert that § 1971(a)(2)(B) is not applicable to this case because SEA 483 merely changes the manner by which individuals prove their identity and does not require individuals to provide any additional information on any voting application or form.
>
> We agree with Defendants' assertion that the act of presenting photo identification in order to prove one's identity is by definition not an "error or omission on any record or paper" and, therefore,

§ 1971(a)(2)(B) does not apply to this case.

*Id.* at \*48 (footnote omitted).

Applying the reasoning of the *Rokita* court, the Court finds that the Photo ID requirement is not "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." *Rokita*, 2006 WL 1005037, at \*48. Further, as the Eleventh Circuit has noted, § 1971(a)(2)(B) "was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294. The 2006 Photo ID Act, however, is not such a practice. Consequently, the 2006 Photo ID Act's Photo ID requirement does not violate § 1971(a)(2)(B), and Plaintiffs therefore do not have a substantial likelihood of succeeding on the merits of this claim.

#### 4. Voting Rights Act Claim

Finally, Plaintiffs assert a claim that the 2006 Photo ID Act's Photo ID requirement violates Section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973(a). That statute provides, in relevant part:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

42 U.S.C.A. § 1973(a). 42 U.S.C.A. § 1973(b) sets forth the requirements for establishing a violation of § 1973(a), and states:

A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973(b). Plaintiffs did not address this claim in their brief in support of their Second Motion for Preliminary Injunction; therefore, the Court need not, and does not, address the claim in its Order.

#### C. Irreparable Harm

For the reasons discussed *supra* Part III.B., the 2006 Photo ID Act's Photo ID requirement unduly burdens the fundamental right to vote with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections, and likely will cause a number of Georgia voters to be unable to cast a vote and to have their votes counted in those elections.

Although Defendants argue that the 2006 Photo ID Act's Photo ID requirement will not deprive a single Georgia voter of the right to vote, because voters without Photo IDs can vote absentee ballots, as a practical matter, a significant number of

the registered Georgia voters who lack Photo IDs likely are unaware of that alternative or would not be able to navigate the absentee ballot voting process successfully for the July 18, 2006, primary elections and the corresponding primary run-off elections. Voters who lack Photo IDs and are unaware of the absentee voting alternative, yet still desire to vote, must undertake the often difficult and burdensome process of obtaining a Voter ID card for the July 18, 2006, primary elections and the corresponding primary run-off elections. The 2006 Photo ID Act's Photo ID requirement thus has the likely effect of causing a significant number of Georgia voters to forego going to the polls or to forego obtaining and voting an absentee ballot.

Defendants note that the *Lake* court already has entered a temporary restraining order against the 2006 Photo ID Act for the July 18, 2006, primary elections and the corresponding primary run-off elections. The *Lake* court's temporary restraining order, however, is due to expire thirty days from its issuance, or prior to the corresponding primary run-off elections. Given those circumstances, the Court cannot find that the *Lake* court's temporary restraining order prevents Plaintiffs from suffering irreparable harm if this Court does not enter a preliminary injunction.

For the reasons discussed above, Plaintiffs have demonstrated that they or their constituents will suffer irreparable harm if the Court declines to enter a preliminary injunction with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections. This factor therefore weighs in favor of granting Plaintiffs' Motion for Preliminary Injunction.

### D. Threatened Injury to Plaintiffs Weighed Against the Damage to the State Caused by a Preliminary Injunction

Next, the Court must weigh the threatened injury to Plaintiffs against the damage to the State caused by a preliminary injunction. Defendants argue that the entry of a preliminary injunction likely will result in confusion for voters, poll workers, and elections officials, and may result in an inconsistent application of the identification requirements. Further, Defendants argue that the evidence indicates that local elections officials lack sufficient time to conduct training for poll workers and to educate the public.

Given that the right to vote is a fundamental right and is preservative of all other rights, denying an individual the right to vote works a serious, irreparable injury upon that individual. Considering the right at issue and the likely injury caused by not entering a preliminary injunction, the potential injury to Plaintiffs outweighs the harm to the State and Defendants caused by entering a preliminary injunction for the July 18, 2006, primary elections and the corresponding primary run-off elections. Further, Defendants already are preparing to comply with the *Lake* court's temporary restraining order, which issued on July 7, 2006, and issuing a preliminary injunction in this case therefore will not place an additional burden Defendants. This factor therefore counsels in favor of entering a preliminary injunction.

### E. Public Interest

Finally, the Court must determine whether issuing a preliminary injunction will serve the public interest. Preventing voter fraud serves the public interest by ensuring that those individuals who have registered properly to vote are allowed to vote and to have their votes counted in any

given election. As discussed *supra* Part III.B., however, the 2006 Photo ID Act's Photo ID requirement, like its predecessor, unduly burdens the right of many properly registered Georgia voters to vote for the July 18, 2006, primary elections and the corresponding run-off elections, and has the likely effect of causing many of those voters to forego voting or of precluding those voters from voting at the polls. Because the right to vote is a fundamental right, removing the undue burdens on that right imposed by the 2006 Photo ID Act's Photo ID requirement serves the public interest. This factor therefore counsels in favor of granting Plaintiffs' Motion for Preliminary Injunction.

### F. Summary

In sum, the four factors for granting a preliminary injunction weigh in favor of Plaintiffs. In particular, Plaintiffs have a substantial likelihood of success on the merits of their claim that the 2006 Photo ID Act's Photo ID requirement unduly burdens the right to vote, at least with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections. Plaintiffs and their constituents also will suffer irreparable harm if the Court does not grant a preliminary injunction with respect to those elections, and the threatened harm to Plaintiffs outweighs the injury to Defendants and the State that will result from issuing a preliminary injunction. Finally, entering a preliminary injunction for the July 18, 2006, primary elections and the corresponding primary run-off elections serves the public interest. For those reasons, the Court grants Plaintiffs' Second Motion for Preliminary Injunction with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections.

### IV. Conclusion

ACCORDINGLY, the Court **GRANTS** Plaintiffs' Second Motion for Preliminary Injunction [108] with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections, and **ENJOINS** and restricts Defendants individually and in their official capacities from enforcing or applying the 2006 Photo ID Act, which requires voters to present a Photo ID as a pre-condition to in-person voting in Georgia, to deny Plaintiffs or any other registered voter in Georgia admission to the polls, a ballot, or the right to cast their ballots and to have their ballots counted because of their failure or refusal to present a Photo ID with respect to the July 18, 2006, primary elections and the corresponding primary run-off elections. The Court will revisit this injunction with respect to the general elections to be held in November 2006.